2015-1418

# United States Court of Appeals
# For the Federal Circuit

RUDOLPH TECHNOLOGIES, INC.

*Appellant*

v.

CAMTEK, LTD.

*Appellee*

*Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Re: Reexamination No. 95/001,874*

**CORRECTED BRIEF OF APPELLANT
RUDOLPH TECHNOLOGIES, INC.**

Daniel W. McDonald
Robert A. Kalinsky
Rachel C. Hughey
Merchant & Gould P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 332-5300

July 13, 2015                    *Attorneys for Appellant*

## <u>CERTIFICATE OF INTEREST</u>

Pursuant to Federal Circuit Rule 47.4, counsel for the Appellant Rudolph

Technologies, Inc., certifies the following:

1. The full name of every party or amicus represented by me is Rudolph Technologies, Inc.

2. The names of the real party in interest (if the real party named in the caption is not the real party in interest) represented by me is Rudolph Technologies, Inc.

3. All parent corporation and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: Rudolph Technologies, Inc. has no parent corporation and is a publicly held corporation.

4. The names of all law firms and the partners or associates that appeared for the parties or amicus now represented by me in the trial court or agency of are expected to appear in this court are:

   Daniel W. McDonald
   Rachel C. Hughey
   Robert A. Kalinsky
   Merchant & Gould P.C.
   3200 IDS Center
   80 South Eighth Street
   Minneapolis, MN 55402

Dated: July 13, 2015                    s/Daniel W. McDonald
                                        Daniel W. McDonald

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................i

TABLE OF AUTHORITIES ...............................................................iv

STATEMENT OF RELATED CASES ...................................................vi

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF THE CASE SETTING OUT THE FACTS RELEVANT
TO THE ISSUES ....................................................................................4

I.      Introduction..................................................................................4

II.     The '528 Patent in Suit Provides Quick, Accurate Inspection of Complex
        Semiconductor Patterns by Training a Visual Model of a Substrate Based
        on Known Good Quality Substrates .............................................7

III.    The Description of the Die-to-Die Comparison in Alumot Does Not
        Disclose Modeling or Training as Claimed in the '528 Patent ....................11

IV.     Procedural History .....................................................................13

        A.      Summary ........................................................................13

        B.      Rudolph Explained that Alumot's Die-to-Die Comparison is
                Substantially Different from the '528 Patent's Modeling and
                Training Claims.............................................................15

        C.      The Board's Decision Relied Solely on the "At Least One" Language
                in the Die-to-Die Comparison Disclosed in Alumot to Find the
                Disputed Elements.........................................................17

SUMMARY OF ARGUMENT .............................................................20

ARGUMENT .....................................................................................22

I.      Standard of Review......................................................................22

II.    The Board Legally Erred in Construing One Sentence in Alumot in Isolation from the Rest of Alumot's Disclosure to Ambiguously Suggest Modeling a Good Die .................................................................................23

III.    The Board Further Erred in Equating the Disputed Claim Elements with Its Ambiguous Interpretation of Alumot's Disclosure of a Comparison Involving "At Least One Other Die." ..............................................................30

IV.    The Board's Errors Infected all the Rejections ............................................34

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................37

ADDENDUM .........................................................................................................39

PROOF OF SERVICE ...........................................................................................40

CERTIFICATE OF COMPLIANCE PURSUANT TO FEDERAL CIRCUIT RULE 32(a) ...........................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Consol. Edison Co. v. N.L.R.B.*,
305 U.S. 197 (1938)...................................................................23

*Ethicon, Inc. v. Quigg*,
849 F.2d 1422 (Fed. Cir. 1988) ...............................................23

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)................................................................30, 33

*In re Chuang*,
No. 14-1257, 2015 U.S. App. LEXIS 2222 (Fed. Cir. Feb. 10, 2015)..............23

*In re Dembiczak*,
175 F.3d 994 (Fed. Cir. 1999) .............................................30, 33

*In re Evanega*,
829 F.2d 1110 (Fed. Cir. 1987) ...........................................24, 29

*In re Fine*,
837 F.2d 1071 (Fed. Cir. 1988) ...........................................24, 29

*In re Freeman*,
30 F.3d 1459 (Fed. Cir. 1994) ...................................................19

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) .................................................22

*In re Kotzab*,
217 F.3d 1365 (Fed. Cir. 2000) ........................................30, 31, 32

*In re Suitco Surface, Inc.*,
603 F.3d 1255 (Fed. Cir. 2010) .................................................23

*In re Wesslau*,
353 F.2d 238 (CCPA 1965) ..............................................24, 29

*Innogenetics, N.V. v. Abbott Laboratories*,
512 F.3d 1363 (Fed. Cir. 2008) .............................................30, 33

iv

*Leo Pharm. Prods., Ltd. v. Rea*,
  726 F.3d 1346 (Fed. Cir. 2013) .........................................................23

*Panduit Corp. v. Dennison Mfg. Co.*,
  810 F.2d 1561 (Fed. Cir. 1987) .........................................................24

*Randall Mfg. v. Rea*,
  733 F.3d 1355 (Fed. Cir. 2013) .........................................................33

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
  859 F.2d 878 (Fed. Cir. 1988) ....................................................23, 29

*Tempo Lighting, Inc. v. Tivoli, LLC*,
  742 F.3d 973 (Fed. Cir. 2014) ..........................................................22

STATUTES

28 U.S.C. § 1295 ..................................................................................1

35 U.S.C. § 6 ........................................................................................1

35 U.S.C. § 103 ............................................................................passim

35 U.S.C. § 141 ....................................................................................1

35 U.S.C. § 142 ....................................................................................1

35 U.S.C. § 143 ....................................................................................1

35 U.S.C. § 144 ....................................................................................1

35 U.S.C. § 316 ..................................................................................23

OTHER AUTHORITIES

37 C.F.R. § 90.3 ..................................................................................1

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), Appellant Rudolph Technologies Inc. ("Rudolph") states that there is no other appeal from the same proceeding in PTO that was previously before this or any other appellate court.

Pursuant to Federal Circuit Rule 47.5(b), Rudolph states that there is one case pending in another other court related to the patent at issue in the present appeal (U.S. Patent No. 7,729,528) that could directly affect or be directly affected by this Court's decision in the pending appeal: *August Technology Corporation et al. v. Camtek Ltd.*, Case No. 11-CV-3707 (D. Minn.). That case is stayed pending the outcome of this proceeding. A second case between the same parties is closed, as it was dismissed without prejudice. *August Technology Corporation et al. v. Camtek Ltd.*, Case No. 10-CV-2202 (D. Minn.).

In addition, there are three pending matters in the district courts related to the parent of the patent at issue in the present appeal (U.S. Patent No. 6,826,298):

- *August Technology Corporation et al. v. Camtek Ltd.*, Case No. 05-cv-1396 (D. Minn.);
- *Rudolph Technologies, Inc. v. Camtek Ltd.*, Case No. 15-cv-01246 (D. Minn.);
- *Camtek USA, Inc. v. Rudolph Techs., Inc.*, Case No. 15- cv-2758 (D.N.J.).

There is also one appeal pending in this Court from the *August v. Camtek*, Case No. 05-cv-1396 (D. Minn.), discussed above, related to the parent of the patent at issue in the present appeal:

- *Rudolph Technologies, Inc. v. Camtek, Ltd.*, Appeal No. 15-1434 (Fed. Cir.).

There have also been two appeals to this Court from the *August v. Camtek*, Case

No. 05-cv-1396 (D. Minn.), discussed above, related to the parent of the patent at

issue in the present appeal:

- *August Technology Corp. v. Camtek Ltd.*, No. 10-1458, 655 F.3d 1278 (Fed. Cir. 2011) (Dyk, Moore, O'Malley);
- *August Technology Corp. v. Camtek, Ltd.*, Nos. 12-1681, 13-1023, 2013 U.S. App. Lexis 23170 (Fed. Cir. Nov. 18, 2013) (Moore, Linn, O'Malley).

# JURISDICTIONAL STATEMENT

The Patent Trial and Appeal Board ("Board") had jurisdiction over Camtek Ltd.'s ("Camtek") *inter partes* reexamination request pursuant to 35 U.S.C. § 6.

On December 15, 2014, the Board issued its Final Written Decision in the *inter partes* reexamination.  (A1-23.)  In compliance with 37 C.F.R. § 90.3(a)(1) and 35 U.S.C. § 142, Rudolph timely filed its Notice of Appeal on January 26, 2015 (A2336) and timely filed it with the Patent and Trademark Office on January 26, 2015.

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141-144.

## STATEMENT OF THE ISSUES

1.      The claims of the '528 patent are generally directed to a semiconductor inspection system that (1) trains or develops a model of a good quality substrate pattern from visually inputting multiple substrates and (2) uses a microprocessor to develop the model and compare images of unknown quality substrates to the model.  The Alumot prior art never refers to collective comparison of die; Alumot instead discloses one-to-one die-to-die comparisons of the pattern of reflected light from one die to the pattern of reflected light from another die.  The Board found the claims at issue obvious in view of Alumot, relying on a single phrase in Alumot that describes comparing one die to "at least one" other die.  The Board found that this phrase was ambiguous in that it could mean either multiple one-to-one die-to-die comparisons, or "comparing multiple patterns collectively."  Is the Board's conclusion that one sentence in Alumot was ambiguous and thus could suggested collective comparisons based on legal error or unsupported by substantial evidence?

2.      The Board interpreted one sentence in Alumot as ambiguous enough to suggest "comparing multiple patterns collectively."  The Board found that this suggestion rendered obvious the visual inspection device, training, modeling, and microprocessor elements of the claims of the '528 patent at issue.  The cited

sentence does not refer to training, modeling, or a microprocessor.  The Board cited no intrinsic or extrinsic evidence to support equating the cited language to these elements.  Regardless of whether the Board erred in interpreting the sentence in Alumot to suggest "comparing multiple patterns collectively," did the Board err in finding that such a suggestion *also* suggested the visual inspection device, training, modeling and microprocessor elements of claims 1-3, 6, 7, 9-11, 14, 17-19, 30-34, and 36 of the '528 patent to render those claims obvious under 35 U.S.C. § 103?

## STATEMENT OF THE CASE SETTING OUT
## THE FACTS RELEVANT TO THE ISSUES

**I.    Introduction.**

This appeal arises from Camtek's request for *inter partes* reexamination of

claims 1-53 of Rudolph's U.S. Patent No. 7,729,528 ("the '528 patent").  The '528

patent describes systems and methods for inspecting substrates such as silicon

wafers used to fabricate computer chips or "die".  (*See* A50, 6:41-45.)  The claims

of the '528 patent are directed to a novel combination of elements including a

visual inspection device (camera) for visually inputting multiple known good

quality substrates to develop a model of a good quality wafer using a

microprocessor.  (A51, 7:5-8, 7:13-16.)  That model can, in turn, be used to inspect

the substrates of unknown quality to distinguish good die from defective die.

(A55-56, 15:56-18:21.)

The Board erroneously found claims of the '528 patent to be obvious in view

of U.S. Patent No. 5,982,921 to Alumot et al. ("Alumot") either alone or in

combination with U.S. Patent No. 5,298,963 to Moriya et al. ("Moriya").  Alumot

discloses a die-to-die wafer inspection method and device that consists of two

comparison phases: (1) a first phase that rapidly compares the reflected light

pattern of one die to the reflected light pattern of another die to designate areas

with possible defects and (2) a second phase that compares the patterns of the

designated areas more closely to determine if, in fact, they contain defects.  (A373,

4

5:30-40; A374, 7:42-45.)  This embodiment teaches a one-to-one comparison of light patterns.[1]  (A375, 9:3-9.)  It does not teach using a two-dimensional camera—indeed, it criticized it—nor did it teach creating a model or using a microprocessor.  (*See* A371, 1:28-34 (criticizing the current art using "two-dimensional images" as "extremely slow").)

The Board erred in determining that a single sentence fragment in Alumot taught (1) a visual input device for training a system or model based on inputting multiple known quality substrates and (2) a microprocessor that develops and uses that model to inspect unknown quality substrates.  Specifically, the entire sentence cited by the Board is as follows, with the phrase it relied upon underlined:

> As also indicated above, during the Phase I examination (and also the Phase II examination), ***the pattern of one die D, serving as the inspected pattern, is compared with the light pattern of <u>at least one other die</u>, serving as the reference pattern***, to determine the likelihood of a defect being present in the inspected pattern.

---

[1] Alumot teaches multiple embodiments, but the Board relied solely on the embodiment that teaches a comparison "of **each die**, called the inspected die, with **another die**, called the reference die."  (A9-10; A375, 9:3-9.)  Alumot teaches two other comparisons: repetitive pattern and die-to-database.  (A12-13.)  The Examiner stated that his response "will be limited to the die-to-die comparison, which is the basis for the rejections at issue."  (A13 (citing A1364-65).)  To the extent the Examiner relied on the repetitive comparison pattern, the Board rejected such reliance as "problematic."  (A13.)  The record shows that the Examiner and the Board both found it appropriate to rely solely on the die-to-die comparison embodiment in Alumot as the basis for any rejections.  (A1364-65; A12-14.)  Thus, the analysis herein focuses on that embodiment.

5

(A374, 8:37-43 (emphasis added), *cited in* A9.)  The Board found that this phrase did not *necessarily* teach creating a reference model based on multiple images, but found that it was ambiguous in that it *could* mean either multiple one-to-one comparisons or "comparing multiple patterns collectively to an inspected die as Requester contends."  (*See* A9-10; A13.)

The Board further found, based solely on the ambiguous possible suggestion of "collectively" comparing multiple patterns, that Alumot "at least suggests that training a model with plural known good quality substrates, where the model is used as a basis for comparison, would have at least been an obvious variation given Alumot's multi-die comparison."  (A10.)  It further found based on the same purportedly-ambiguous reference that Alumot suggests a visual inspection device and microprocessor that develops a model of a substrate using plural known good quality substrates and compares die to that model.  (A10.)  The Board relied on no intrinsic or extrinsic evidence or anything else to support the findings that this lone sentence in Alumot teaches or suggests training using multiple substrates or a microprocessor that develops a model based on multiple substrates and compares substrates to the model.  (A9-10.)

As discussed above, Alumot does not disclose training a model as part of the die-to-die comparison.  While Alumot does talk about a "model" in the (die-to-database) embodiment, that embodiment was properly not relied upon by the

6

Board, and its model is not trained based on inputting multiple substrate images. (A384, 27:43-60; A12-14.)  Nowhere does Alumot disclose using a plurality of known good quality substrates to train a model, as required by the claims of the '528 patent.  Nor does Alumot disclose a microprocessor that develops such a model and compares substrates to the model, also as required by the claims of the '528 patent.

The Board used a legally-flawed analysis of Alumot and lacked substantial evidence to support its determination that Alumot suggested the noted limitations of the rejected claims of the '528 patent and thus its obviousness decision should be reversed.

## II.   The '528 Patent in Suit Provides Quick, Accurate Inspection of Complex Semiconductor Patterns by Training a Visual Model of a Substrate Based on Known Good Quality Substrates.

The surge in electronic devices has led to increased production of microchips used to control those devices.  Hundreds or even thousands of small microchips can be fabricated on a thin, round, reflective silicon wafer (or "substrate") that may be 6" to 12" wide.  These substrates must be accurately and quickly inspected to determine if the microchips (or "die") fabricated on the wafers are of good or bad quality.  Because working chips are important to customers but chips are expensive to make, inspection both ensures that bad chips are rejected and ensures that good chips are not rejected.

7

Once chip inspection was manual, involving rows of employees looking at wafers through a microscope to examine the die for defects.  Manual visual inspection was slow, expensive, and subject to human error.  Early automated systems struggled with speed and accuracy.

The '528 patent claims a novel and unique automated microchip inspection system.  It uses an automated system that visually (via a camera) inspects die on wafers.  (A50, 6:41-45; A51, 7:5-6.)  The camera system may be any type of camera capable of high resolution inspection.  (A52, 9:67-10:1.)  The computer "trains" a model of a good quality die based on capturing images of multiple known good quality substrates during a training phase.  (A49, 4:27-30, 4:54-57.)  Specifically, the model recognizes acceptable variations in the inspected die that may inaccurately be found unacceptable when compared to a single die.  (A55, 15:62-65.)  By creating a model from imaging multiple die during training, the inspection device accounts for color and other visual variations that could lead to false negatives if a one-to-one comparison was used.  (A54-55, 13:4-15:42.)  In other words, the computer uses images of substrates that are known to be good quality to create a model to inspect the substrates of unknown quality.

In a preferred embodiment, the system (10) is trained by viewing a plurality of "good die" to form a good die model within a computer system (26) to define what an ideal substrate should look like based upon the common characteristics,

8

elements, ranges, etc. viewed.  (A14, 13:4-9; A53, 11:56.)  Preferably, a spectrum of acceptable deviations is supplied by this training set to meet the definitional requirements of a mean and standard deviation.  (A54, 13:4-24.)  Training with multiple substrates improves the system's ability to recognize that certain variations are acceptable, so that only good quality substrates are accepted and only bad die are rejected.  (A54, 13:13-21, 14:24-27.)

Multiple die are used to develop a statistical model of the image of a die including acceptable variations.  (A54, 13:8-19, 14:28-60.)  For example, a gray scale is used for each pixel in the camera image, providing a value from 0 to 255 to indicate variation from pure black to pure white.  (A54, 14:47-53.)  A mean may be determined from the pool of die used.  (A54, 13:13-19, 14:47-49.)  Standard deviations of the gray scale value of each pixel may be determined from the pool of die viewed to determine acceptable variation from the mean for each pixel. (A54, 14:54-60.)  These acceptable variations may be adjusted based on viewing additional die.  (A54, 14:28-67.)

Once the model is developed, substrates of unknown quality are inspected by the inspection device in a single inspection phase.  (A55-56, 15:56-18:21.)  The unknown quality substrate images are compared to the model to determine a quality of the unknown quality substrates.  (A55-56, 15:56-18:21.)

The claims of the '528 patent generally recite a semiconductor inspection system that (1) trains the system or develops a model of a good quality substrate pattern by visually inputting multiple substrates and (2) compares unknown quality substrates to the model using a microprocessor.  (A49, 4:14-30, 4:54-57; A55-56, 15:56-18:21.)  Claim 1 is representative of the invention claimed in the '528 patent:

> 1. An automated system for inspecting a substrate, the system comprising:
> a wafer test plate;
> a substrate provider for providing a substrate to the test plate, wherein the substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, at least one portion of a patterned wafer, an individual die, at least one portion of an individual die, a plurality of individual die, at least one portion of a plurality of individual die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC tray, and an Auer boat;
> a visual inspection device for visual inputting of a plurality of known good quality substrates having a user defined level of quality during training and for visual inspection of other unknown quality substrates during inspection;
> an illuminator for providing short pulses of light to each of the unknown quality substrates during movement between the substrate and the visual inspection device; and
> a microprocessor having processing and memory capabilities for developing a model of good quality substrate and comparing unknown quality substrates to the model.

(A58, 21:11-33.)

III.    **The Description of the Die-to-Die Comparison in Alumot Does Not Disclose Modeling or Training as Claimed in the '528 Patent.**

Alumot describes a two-phase system for inspecting the surface of a chip or wafer. (A330.) The first phase optically examines the complete surface of the article inspected at a relatively high speed and relatively low resolution to find locations of possible defects. (A371, 2:10-13, 2:57-61.) The second phase optically examines only the suspected locations at a higher resolution for defects. (A371, 2:8-24.)

Alumot distinguishes systems that "are generally based on analyzing high resolution two-dimensional images of the patterned wafer utilizing an opto-electric converter, such as a CCD (charge-coupled device), on a pixel-by-pixel basis." (A371, 1:28-33.) Alumot criticizes such systems (like the fast one later claimed in the '528 patent in suit) as being "extremely slow" due to the "extremely large number of pixels involved." (A371, 1:33-35.)

The "die-to-die comparison" embodiment in Alumot does not use images of the substrate patterns captured with a camera. Instead, it collects and compares the reflected light patterns of one reference die and the light patterns of one inspection die. (A375, 9:3-9; A474, 7:42-45.) Alumot describes shining a laser on the surface of a wafer and using a number of (e.g., eight) light collectors arranged in a circular array as shown in Figure 6:

11



FIG . 6

(A335; A374, 7:42-55.)  Alumot is designed to collect reflections of defects, not images of the patterned die.  (A374, 8:12-14.)  "Such an arrangement minimizes the amount of pattern-reflected light collected by the light collectors, that is, such an arrangement does not see most of the pattern, except pattern irregularities, corners and curves."  (A372, 3:23-27; *see also* A374, 7:49-50.)  Dies on the wafer are continuously scanned to produce the scattered light collected by the light collectors, enabling a die-by-die comparison to indicate the probability of a defect. (A375, 9:3-8.)

When describing Figure 10, Alumot teaches that this die-to-die comparison is a one-to-one comparison "of **each die**, called the inspected die, with **another**

**die**, called the reference die, to produce an indication of the probability of a defect in the inspected die." (A375, 9:3-9 (emphasis added).)  In a related section describing Figure 9, Alumot again discloses one-to-one die comparisons.  (*See* A374, 8:44-45 ("FIGS. 9-11 illustrate the manner of carrying out the scanning of the wafer in the Phase I examination.").)

## IV.   Procedural History.

### A.   Summary

Camtek filed a request for *inter partes* reexamination of claims 1-53 of the '528 patent on January 19, 2012.  (A68; A112.)  On March 26, 2012, the Examiner granted the request in part, finding there was a reasonable likelihood that Camtek would prevail on claims 1-3, 6-7, 9-11, 14, 17-19 as being obvious over Alumot in view of Moriya and claims 30-34 and 36 as being anticipated over Alumot.  (A553; A544.)  The Examiner also found that Camtek failed to establish a reasonable likelihood that it would prevail with respect to claims 4-5, 8, 12-13, 15-16, 20-29, 35, and 37-53.  (A553-54.)  In a non-final Office Action, the Examiner found claims 1-3, 6-7, 9-11, 14, 17-19 were obvious over Alumot in view of Moriya and 30-34 and 36 were anticipated by Alumot.  (A580-86.)  Rudolph responded to this action on May 28, 2012, claiming that Alumot in view of Moriya failed to teach or suggest claims 1-3, 6-7, 9-11, 14, 17-19 and that Alumot failed to anticipate claims 30-34 and 36.  (A642-69.)

13

After substantive examination, the Examiner issued a Right of Appeal Notice on February 1, 2013, in which the rejections of claims 1-3, 6-7, 9-11, 14, 17-19 as being obvious over Alumot in view of Moriya and claims 30-34 and 36 as being anticipated by Alumot were maintained.  (A1367-72.)  Rudolph filed a timely notice of appeal to the Board on February 28, 2013.  (A1430-32.)  Camtek filed a notice of cross appeal of the decision not to institute reexamination of claims 4-5, 8, 12-13, 15-16, 20-29, 35, and 37-53.  (A1433-35.)

The Board held an oral hearing on the cross-appeals on December 3, 2014. (A2339.)  On December 15, 2014, the Board affirmed in part and reversed in part the Examiner's rejections, rejecting claims 30-34 and 36 in view of Alumot on a new basis while affirming the rejection of claims 1-3, 6, 7, 9-11, 14, and 17-19 as being obvious in view of Alumot and Moriya.  (A20; A7-17.)  No other grounds for rejections are currently on appeal.  (A2336.)  The Board found it lacked jurisdiction to decide Camtek's cross-appeal.  (A19.)  Rudolph timely appealed to this Court.

### B. Rudolph Explained that Alumot's Die-to-Die Comparison is Substantially Different from the '528 Patent's Modeling and Training Claims.

Rudolph showed that Alumot's die-to-die comparison differs from the '528 patent's novel approach to training a model using multiple known good quality substrates. Specifically, Rudolph explained that Alumot's die-to-die embodiment compared the reflected light pattern of one single reference die to the light pattern of one inspection die:



(A1636.) Rudolph also explained that, unlike Alumot, the '528 patent trained a model using inputs from visually inspecting multiple known good quality substrates, then compared the model to an unknown quality substrate:



(A1636.)

Rudolph noted that the key passage in the die-to-die comparison embodiment in Alumot—"the pattern of one die D, serving as the inspected pattern, is compared with the light pattern of at least one other die, serving as the reference pattern"—must be read in the context of "illustrat[ing] the manner of carrying out scanning of the wafer."  (A374-75, 8:44-45, 9:3-9.)  In context, the "at least one other die" language suggested only multiple one-to-one (e.g., Comparison 1 and separate Comparison 2) die pattern comparisons:



(A1640.)  This embodiment does not disclose training a model or using the model with a microprocessor, or any other comparison involving multiple reference die collectively compared to a single inspected die.  (A374-75, 7:7-9:22.)

C.    **The Board's Decision Relied Solely on the "At Least One" Language in the Die-to-Die Comparison Disclosed in Alumot to Find the Disputed Elements.**

The Board based its decision on one sentence in Alumot, at Camtek's urging:

> As also indicated above, during the Phase I examination (and also the Phase II examination), ***the pattern of one die D, serving as the inspected pattern, is compared with the light pattern of <u>at least one other die</u>, serving as the reference pattern***, to determine the likelihood of a defect being present in the inspected pattern.

(A374, 8:37-43, *cited in* A9 (underlining in original, emphasis added).)  The Board agreed with Rudolph in part, finding that this sentence does not *necessarily* disclose a model based on multiple known good quality substrates.  (A13-14.)  Indeed, the Board reversed the Examiner's anticipation rejections for this very reason.  (A12-15.)

The Board found that "Alumot does not indicate clearly whether this multi-die comparison involves (1) multiple one-to-one die comparisons as [Rudolph] contends, or (2) comparing multiple patterns collectively to an inspected die as [Camtek] contends.  At best, the passage is ambiguous in this regard."  (A9-10.)  After concluding that Alumot is ambiguous as to whether it discloses comparing multiple patterns "collectively" to an inspected die, the Board found that Alumot could be read to *suggest* that feature.  (A9-10.)  The Board's reasoning and factual findings regarding the suggestion of obviousness, virtually in its entirety, were:

17

> [S]killed artisans would understand that there are only two possibilities to compare a die's pattern with that of multiple other dies in Alumot: the comparison is either done *individually* on a die-by-die basis (i.e., multiple one-to-one comparisons) or *collectively* (i.e., plural-to-one comparison). Given these two possibilities, we find that the weight of the evidence on this record favors the Examiner's and Requester's position, at least to the extent that Alumot at least suggests that training a model with plural known good quality substrates, where the model is used as a basis for comparison, would have at least been an obvious variation given Alumot's multi-die comparison.

(A10 (emphasis in original).)  The Board did not make any additional factual findings supporting its obviousness conclusion rejecting claim 1.  (*See* A10.)  Nor did it cite anything specific in the record.  (*See* A10.)  No expert testimony was provided.  (*See* A10.)

The Board did not cite any express teaching of modeling or training anywhere in Alumot.  Moreover, the Board did not find that Alumot discusses how one would create "the [reference] pattern" as a model based on multiple reflected light patterns.  Indeed, the Board made no findings that Alumot teaches or suggests anything about how any such modeling would be done.  The Board also found that this purported ambiguity further suggested both a visual inspection device used for training a model with multiple substrates and inspection, and a microprocessor used to develop a model of a good quality die and compare the model to inspected die.  (A10.)

The Board found that claim 1 of the '528 patent was rendered obvious by Alumot and Moriya, although it only discussed Alumot in its reasoning.  (A10.)  It

found that the reference in claim 1 to training did not necessarily involve training a *model*, ignoring Rudolph's showing that a district court construed "training" in the parent patent as "Examining wafers to *develop a model* of a good quality wafer." (A8; A1639 (citing A270 (emphasis added)).)  The Board further found that, whether or not claim 1 required multiple wafers to train the system or to train a model,[2] Alumot suggested the feature as part of the visual inspection device element of claim 1.  (A9.)  The Board found dependent claims 2, 3, 6, and 7, which depend on claim 1, obvious for the same reason as claim 1.  (A10.)  The Board found claims 9-11, 14, 17-19 obvious for reasons similar to the reason cited for rejecting claim 1.  (A11.)

The Board did not sustain the Examiner's anticipation rejections of claims 30-34 and 36 based on Alumot.  (A12-15.)  The Board found, based on its previously-noted analysis of the "at least one" language in Alumot, that Alumot did not *necessarily* disclose the claim elements, including the requirement of a

---

[2] Alumot does not disclose the elements of claim 1 regardless of whether the claim refers to training a model or training a system.  The Board's decision does not appear to turn on its construction of "training."  To the extent this construction is relevant, the Board erred in adopting a broader construction than the district court construction.  Camtek did not contest the district court construction during its appeal of the resulting judgment, and is estopped from challenging it now.  *See In re Freeman*, 30 F.3d 1459 (Fed. Cir. 1994) (finding that because a patentee had a full opportunity to litigate a claim term construed in court, it was bound by that construction in reexamination due to issue preclusion).  In any event, the Board's contrary construction was based on an erroneous interpretation of the appellate decision and is not supported by the record.

reference model based on multiple images.  (A12-13; A15.)  The Board

nevertheless rejected claims 30-34 and 36 on new grounds.  (A15.)  It rejected

claims 30-34 and 36 as obvious because it found that Alumot *suggested* creating a

reference model based on at least two images, as required by claim 30, "for the

reasons indicated previously."  (A15-17.)  Claims 31-34 and 36, which depend on

claims 30 and 32, were similarly rejected.  (A15-17.)

Thus, all of the Board's obviousness rejections rise and fall with the

determination that three purportedly-ambiguous words in Alumot's specification

suggest multiple claim elements directed to training a model of a good-quality

substrate (such as a die) by visually inputting multiple known good quality

substrates and comparing inspected die to the model.

## SUMMARY OF THE ARGUMENT

The Board's determination of obviousness is based on legal errors.  First, the

Board erroneously found a sentence in Alumot was ambiguous without properly

considering how one having ordinary skill in the art would have interpreted the

sentence in context.  In context, the sentence refers only to one or more

comparisons to "the" single pattern, not a model of a pattern derived from a

collection of patterns.  No other discussion of the embodiment refers to or suggests

a model or collective comparison.

The Board relied on an embodiment in Alumot that discloses a method of inspecting die based solely on an individual die-to-die comparison.  Alumot collects light patterns reflected from defects, minimizing the light collected from the die pattern.  Alumot does not disclose training the system, and says nothing about creating a model based on visually inspecting multiple die.  The die-to-die embodiment description in Alumot talks only of one-to-one comparisons; there is no "collective comparison" and no modeling or training.

Had the Board properly considered the sentence in context, the Board would not have found that the "at least one" language in Alumot suggests "comparing multiple patterns collectively."  The failure to consider the sentence in context and resulting finding of ambiguity was legal error.

Because only one of the two possible meanings of the sentence cited by the Board is supported by the context of the specification, that is the only legally-supported meaning that one of ordinary skill would ascribe to the statement. Therefore, when "at least one" is properly read in light of the many references to individual die-to-die comparisons, it is not ambiguous, and Alumot does not suggest collective comparisons.  Without such a suggestion, there is no basis to find that Alumot renders the '528 patent claims obvious.

Second, the Board erred in finding, without any supporting analysis, that the purported suggestion in Alumot of "comparing multiple patterns collectively" was

21

the same thing as the disputed claim elements in the '528 patent.  Comparing patterns "collectively" does not necessarily involve modeling or training through a visual inspection device.  Moreover, the "at least one" sentence fragment does not suggest a microprocessor for developing a model and comparing a substrate to the model.  The Board erred in failing to make supportable findings of fact necessary for equating "collective comparison" to these claim elements.  The Board improperly used hindsight.  These conclusory determinations demonstrate that the Board's obviousness decision was legally flawed and lacked substantial evidence, regardless of whether Alumot ambiguously suggests "collective comparison."  Because there is no substantial basis for the Board's finding that "collective comparison" suggests the claim elements, the Board's decision should be reversed.

This Court should find that Alumot does not teach or suggest the claim elements at issue, and reverse the Board's findings.


## ARGUMENT

### I.    Standard of Review.

The Federal Circuit "reviews the Board's legal conclusions *de novo* and its factual findings for substantial evidence."  *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 976-77 (Fed. Cir. 2014).  Obviousness under 35 U.S.C. § 103 is a question of law based on underlying facts.  *In re Gartside*, 203 F.3d 1305, 1316

(Fed. Cir. 2000).  The Board's legal conclusion of obviousness is reviewed *de novo*; its underlying factual findings are reviewed for substantial evidence. *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *In re Chuang*, No. 14-1257, 2015 U.S. App. LEXIS 2222, at *2 (Fed. Cir. Feb. 10, 2015).  "Based on the underlying fact findings, whether a claimed invention would have been obvious under 35 U.S.C. § 103(a) is a question of law reviewed de novo."  *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1353 (Fed. Cir. 2013).

The claims of a patent must be shown to be unpatentable by a preponderance of the evidence.  35 U.S.C. § 316(e); *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427 (Fed. Cir. 1988) (explaining that in an *inter partes* reexamination, "a preponderance of the evidence must show nonpatentability before the PTO may reject the claims of a patent application").  "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence . . . and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010) (internal citations and quotations omitted).

## II.    The Board Legally Erred in Construing One Sentence in Alumot in Isolation from the Rest of Alumot's Disclosure to Ambiguously Suggest Modeling a Good Die.

When determining obviousness, "prior art patents must each be read 'as a whole.'"  *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 887

(Fed. Cir. 1988) (citing *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1577

(Fed. Cir. 1987)).  It is not permissible to pick and choose from a reference while

excluding parts that fairly suggest what the reference would teach a person of skill

in the art:

> It is impermissible within the framework of section 103 to pick and choose
> from any one reference only so much of it as will support a given position,
> to the exclusion of other parts necessary to the full appreciation of what such
> reference fairly suggests to one of ordinary skill in the art.

*In re Wesslau*, 353 F.2d 238, 241 (CCPA 1965).  Instead, a prior art reference must

be considered in its entirety.  *Id.*; *see also In re Fine*, 837 F.2d 1071, 1075 (Fed.

Cir. 1988) ("[O]ne cannot use hindsight reconstruction to pick and choose among

isolated disclosures in the prior art to deprecate the claimed invention."); *In re*

*Evanega*, 829 F.2d 1110, 1112 (Fed. Cir. 1987) (explaining that a patent must be

evaluated in its entirety); *Ex parte Raychem Corp.*, 1990 Pat. App. LEXIS 12, at

*17 (Bd. Pat. App. & Int'f 1990) ("[A] prior art reference must be considered in its

entirety").

The Board's determination that Alumot rendered claims 1-3, 6, 7, 9-11, 14,

17-19, 30-34, and 36 obvious under 35 U.S.C. § 103 was legally flawed because its

sole support is part of a single sentence in Alumot's die-to-die comparison

description that discloses comparing "the pattern of an inspected die to the pattern

of "at least one" other die.  (A9-10; A11; A15-17.)  The Board's finding that this

sentence *could* mean comparing a die to "multiple patterns collectively" is legally

flawed because it is taken out of and ignores the context of Alumot.  (*See* A9-10.)

In context, the sentence only describes comparisons between the reflected light

patterns of two single die.  (A374, 8:37-43; A375, 9:3-9.)

The entire sentence relied upon by the Board for its obviousness findings is

as follows:

> As also indicated above, during the Phase I examination (and also the Phase II examination), ***the pattern of one die D, serving as the inspected pattern, is compared with the light pattern of <u>at least one</u> other die***, ***serving as the reference pattern***, to determine the likelihood of a defect being present in the inspected pattern.

(*See* A9-10 (underlining in original, emphasis added); A374, 8:37-43.)  The Board

noted that the parties disputed the interpretation of this sentence, finding that the

sentence did "not indicate clearly whether this multi-die comparison involves (1)

multiple one-to-one die comparisons as [Rudolph] contends, or (2) comparing

multiple patterns collectively to an inspected die as [Camtek] contends," and thus

was at best "ambiguous in this regard."  (A9-10.)  The Board assumed that the

passage suggested multiple one-to-one comparisons, but nevertheless found that

Alumot "at least suggests the other alternative."  (A10.)  The Board cited no

intrinsic or extrinsic evidence to support this conclusion, other than its finding that

"skilled artisans would understand that there are only two possibilities to compare

a die's pattern with that of multiple other dies in Alumot: the comparison is either

done individually on a die-by-die basis (i.e., multiple one-to-one comparisons) or collectively (i.e., plural-to-one comparison)." (*See* A10.)

Camtek's construction as adopted by the Board as a possible meaning of the cited sentence distorts and ignores the sentence as a whole. The sentence compares "the pattern of one die" and "***the light pattern*** of at least one other die, *serving as the reference pattern*." (A374, 8:37-43 (emphasis added).) The word "pattern" is used with the phrase "at least one other die," showing that the same "pattern" applies whether the comparison is to one die or more than one. Nothing about the sentence suggests that "the reference pattern" would be something different for one die versus multiple die. The Board's analysis requires that "the . . . pattern" be two different things depending on whether one die or multiple die are used. In contrast, Rudolph's construction—multiple one-to-one comparisons— allows "the pattern" to be the same thing for a single die and multiple die. Camtek's and the Board's alternate construction does not. Where one construction is consistent with the syntax of the sentence and the other is not, there is no ambiguity. The construction of the sentence that is internally consistent is the only one that should be used.

Moreover, Camtek's "collective comparison" construction, unlike Rudolph's, is also inconsistent with the rest of Alumot's discussion of the die-to-die comparison. Alumot uniformly describes the die-to-die comparison as

involving two light patterns from two single die, not collective comparison.  The

section relied upon by the Board is in a paragraph describing Fig. 9 of Alumot.

(A374, 8:29-44.)  Figure 9 depicts die D on a wafer:



(A338.)  Alumot explains that "the pattern of one die D, serving as the inspected

pattern, is compared with the light pattern of at least one other die, serving as the

reference pattern, to determine the likelihood of a defect being present in the

inspected pattern.  FIGS. 9-11 illustrate the manner of carrying out the scanning of

the wafer in the Phase I examination."  (A374, 8:39-44.)

As the specification moves on to describing Figure 10, Alumot expands on

the "manner of carrying out the scanning of the wafer."  Alumot describes this

inspection as one-to-one, or "die-by-die:"

In this manner, different dies on the same wafer are continuously scanned to produce the scattered light collected by the light collectors 42 (or 42', FIGS. 6a-8a) so as to enable a die-by-die comparison to be made of **each die**, called the inspected die, with **another die**, called the reference die, to produce an indication of the probability of a defect in the inspected die.

(A375, 9:3-9 (emphasis added).)

This section confirms that the cited sentence of Alumot refers only to one or more individual die-to-die comparisons. Nowhere does Alumot discuss comparison of a die to a collective model of a die based on multiple known good quality substrates. Instead, a fair reading of Alumot's teachings as a whole only supports the interpretation that "at least one" means multiple one-to-one die comparisons. (A371, 2:50-51 ("The reference pattern may be a pattern on another like article (e.g., die-to-die comparison . . . .").)

Consistent with its focus on speed at the expense of accuracy in phase I, Alumot discloses an invention where the inspected die and the reference die are near-simultaneously examined to determine if there are differences between the two. (A375, 9:25-42 (describing comparing the flow of data streams from the light detector from the inspected pattern to the reference pattern, and correcting any misalignment).) The Phase I scan of the die is less accurate but speedy, with errors in detecting defects sorted out in Phase II. (A371, 2:19-21, 2:33-49.) There is no suggestion anywhere of how this scan would occur if it involves "collective" comparison. This further confirms that, when read as a whole, Alumot's die-to-die

comparison does not suggest collective comparison.  In short, Alumot's specification confirms that "at least one" means only multiple one-to-one die comparisons, not collective comparisons.

The Board erred as a matter of law by picking and choosing only one sentence fragment of Alumot to support its obviousness finding while disregarding the teachings of Alumot as a whole, or indeed the entirety of the cited sentence. *See SmithKline*, 859 F.2d at 887; *Fine*, 837 F.2d at 1075; *Evanega*, 829 F.2d at 1112; *Wesslau*, 353 F.2d at 241; *Raychem*, 1990 Pat. App. LEXIS 12, at *17.  The Board failed to acknowledge that nowhere does Alumot teach a single collective comparison (presumably of a model based on multiple patterns) to an inspected pattern.  Alumot read as a whole does not render the sentence "the pattern of one die D, serving as the inspected pattern, is compared with the light pattern of at least one other die, serving as the reference pattern" ambiguous—it clearly refers only to *multiple one-to-one comparisons*, not comparing multiple patterns collectively to an inspected die.  Where one possible meaning of a sentence is perfectly consistent with its context and teachings but the other is not, the sentence should not be found to be ambiguous.  Properly considered, Alumot lacks any substantial basis for such a finding.  Because this legally-flawed and baseless finding was the basis for all of the rejections, the Board's conclusion of obviousness should be reversed.

**III.    The Board Further Erred in Equating the Disputed Claim Elements with Its Ambiguous Interpretation of Alumot's Disclosure of a Comparison Involving "At Least One Other Die."**

"A critical step in analyzing the patentability of claims pursuant to section 103(a) is casting the mind back to the time of invention, to consider the thinking of one of ordinary skill in the art, guided only by the prior art references and the then-accepted wisdom in the field." *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000). "We must still be careful not to allow hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention." *Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363, 1373-74 n.3 (Fed. Cir. 2008). *See also Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966) (recognizing that the obvious analysis must "guard against slipping into use of hindsight and to resist the temptation to read into the prior art the teachings of the invention in issue") (internal citations and quotations omitted).

Likewise, conclusory statements are not evidence, and basing an obviousness decision on them is legally erroneous. *In re Dembiczak*, 175 F.3d 994, 999-1000 (Fed. Cir. 1999) (finding where the Board failed to particularly identify a suggestion to create the invention, but merely relied on conclusory statements that there was a suggestion, the Board's conclusion of obviousness was legal error). To support its obviousness finding, the Board must not overstate a

minimal disclosure in the prior art just to render obvious the disputed claim elements. *See Kotzab*, 217 F.3d at 1369. *Kotzab* is illustrative. There, the Board reversed an examiner's determination in a reexamination that the claims at issue were obvious in light of a prior art reference. *Id.* at 1370-71. The Board had determined that the prior art description of "one system" meant "one sensor," based on a disclosure in the reference that "one *system* constructed and operated according to the invention may be used to control a number of valves." *Id.* at 1370 (emphasis in original). The Board asserted that since the reference taught a single sensor being used at a selected part of the machine, the reference necessarily taught or suggested that the "system" may only have one sensor. *Id.* at 1371.

This Court reversed, holding that the Board's decision lacked substantial evidence. *Id.* at 1370. The Board's conclusion "necessarily rest[ed] on the unstated premise by the Examiner that 'one system' is equal to 'one sensor.'" *Id.* This Court reasoned that "there was no finding as to the specific understanding or principle within the knowledge of a skilled artisan that would have motivated one with no knowledge of [the patent owner's] invention to make the combination in the manner claimed." *Id.* at 1371. The Court analyzed the reference as a whole, and found no support for the Board's interpretation of the single phrase. *Id.* This Court elaborated, "more than a mere scintilla of evidence is necessary to support the Board's implicit conclusion that 'one system' is equal to 'one sensor.'" *Id.* It

overruled the Board's decision of obviousness because the Board impermissibly "fell into the hindsight trap" and made a decision "without substantial evidence to support the Board's findings of fact." *Id.* at 1371-72.

As shown above, the Board in this instance improperly viewed the "at least one" language in isolation to find it ambiguously suggested "comparing multiple patterns collectively." The Board further erred when it equated this purported possible meaning of Alumot with the claim elements at issue with no supporting evidence. Specifically, "comparing multiple patterns collectively" is not a suggestion of the claim elements directed to modeling a substrate based on multiple good quality substrates or of a microprocessor which develops the model and compares it to a substrate of unknown quality.

There is nothing in Alumot—no extrinsic evidence, and no other evidence cited by the Board—relating to how "at least one die" equates to training a model or the microprocessor as claimed. There was no finding of a "specific understanding or principle within the knowledge of the skilled artisan" to support this leap of logic. *Kotzab*, 217 F.3d at 1371. As in *Kotzab*, here the Board offered no explanation as to why one with ordinary skill in the art at the time of the invention would have viewed the phrase "at least one" as suggesting the disputed claim elements directed to training or modeling a good quality die based on visually inspecting known good quality substrates *and* a microprocessor for

32

developing a model and inspecting substrates using the model.  This error should result in reversal of the Board's decision finding the claims obvious.

The only reference in the Board's opinion to the basis for finding that Alumot disclosed training a model was what Camtek had argued about the phrase. (A9 ("[Camtek], however, interprets Alumot as teaching an approach where one or more light patterns can serve as a reference pattern that is compared with the inspected die.") (emphasis removed).)[3]  Basing an opinion of obviousness on arguments by counsel is the exact type of hindsight the Federal Circuit has warned to avoid.  *Graham*, 383 U.S. at 36; *Innogenetics*, 512 F.3d at 1373.  Indeed, such broad, conclusory statements are not evidence.  *Dembiczak*, 175 F.3d at 999.

The Board further failed to find the level of ordinary skill in the art, exacerbating its failure to make factual findings regarding the meaning of "at least one."  *Randall Mfg. v. Rea*, 733 F.3d 1355, 1362-63 (Fed. Cir. 2013) (finding that the Board's failure to consider evidence of the knowledge of one of skill in the art was plainly prejudicial); *Dembiczak*, 175 F.3d at 1000 (finding that the Board's failure to make necessary factual findings, including the level of ordinary skill in the art, led to the Board's deficient obviousness holding); *Graham*, 383 U.S. at 17.

---

[3] The Board cites the Third Party Respondent Brief.  (A9 (citing (A1875)).)  The Third Party Respondent Brief likewise does not mention anything as evidence beyond Camtek's interpretation of Alumot.  (A1874-77.)

The Board's unsupported leap of logic amounts to impermissible hindsight. This finding lacks substantial evidence.  Because this unsupported leap was the only basis for the conclusions provided in the Board's opinion, the obviousness determination must be reversed.

## IV.    The Board's Errors Infected all the Rejections.

While the independent claims at issue varied to some extent in language and scope, the above-identified errors infected all the rejections.  Claim 1 recites a visual inspection device for visually inputting plural known good quality substrates during training, and a microprocessor for developing a model of good quality substrate and comparing unknown quality substrates to the model.  (A58, 21:11-33.)  Whether or not the district court's construction of training—"Examining wafers to develop a model of a good quality wafer"—is applied, Alumot's "at least" language does not suggest these elements.

Claim 9 recites "training a model as to parameters of a good substrate via optical viewing of multiple known good substrates" and "inspecting the unknown quality substrates using the model, thereby identifying acceptable quality substrates."  (A58, 21:58-22:10.)  For the reasons provided above, these limitations are not suggested by Alumot either.

Claim 14 recites "a controller for comparing pixel data for unknown quality substrates to a model of a good quality substrate."  (A58, 22:23-39.)  Unlike the

other independent claims, claim 14 does not recite training or modeling based on inputting multiple substrates. The "at least one" language in Alumot thus is of little relevance. Because the cited language in Alumot does not suggest modeling a substrate, there is no substantial basis for finding that Alumot suggests "comparing pixel data for unknown quality substrates to a model of a good quality substrate."

Claim 30 recites a method that includes collecting images of two known quality substrates while the substrates are in motion. (A59, 29:8-46.) It also recites creating a reference model based on the two images, and comparing images of the substrate captured while it is in motion to the reference model. (A59, 29:8-46.) The Board found that the Examiner erred in rejecting claims 30-31 on the basis that Alumot anticipated claim 30 because Alumot does not necessarily teach creating a model based on two images. (A14.) The Board adopted a new rejection of the claims as obvious under 35 U.S.C. § 103(a), however. (A15-17.) This new rejection is similarly erroneous because Alumot's "at least one" language does not suggest the creating-a-model limitation of claim 30.[4]

Claim 32 recites a "means for comparing the captured images to a reference model to detect defects in the substrate." (A59, 24:50-67.) This means-plus-

---

[4] The Board Decision asserts that the Examiner's findings that Alumot taught all elements of claims 30 and 32-34 were "undisputed." (A15-16.) This is incorrect as Rudolph did contest these findings. (*See* A1642-43.)

function clause had an acknowledged corresponding structure of "a computer system having processor and memory capabilities for (1) saving the inputted die, (2) developing a model therefrom, and (3) comparing or analyzing other die in comparison to the model." (A14-15.) The Board found the Examiner's anticipation-based rejection of claim 32 was erroneous, and again entered a new rejection based on Alumot and § 103(a). (A14-17.) The Board's new rejection of claims 32-34 and 36 as obvious is similarly based on the erroneous finding that Alumot's "multi-die comparison" (referring to "at least one" die) disclosure "at least suggests" creating a model from multiple images. (A17.)

All of the Board's rejections were based on the legally-flawed analysis of the "at least one" language in Alumot without regard to Alumot's teachings as a whole. The findings were further in error because the Board lacked substantial evidence to support equating the purported "collective" comparison of Alumot with the modeling, training, and microprocessor-related elements of the claims at issue. Because the Board decision was based on legal error and lacked substantial evidence, this court should reverse and find that Alumot does not render claims 1-3, 6, 7, 9-11, 14, 17-19, 30-34, or 36 obvious.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The Board erred in finding claims 1-3, 6, 7, 9-11, 14, 17-19, 30-34, and 36 obvious under 35 U.S.C. § 103 in view of Alumot when it found one part of one sentence in Alumot suggested training a model based on multiple dies.  The error was twofold.  One, the ambiguous construction of that sentence was reached in isolation, without a fair reading of either that sentence or Alumot as a whole. When Alumot is considered in context and as a whole, the sentence at issue in Alumot does not suggest a "collective comparison" but rather only multiple one-to-one die-to-die comparisons.  Two, the Board erred in equating Alumot's purported suggestion of "collective comparisons" with the training, modeling, and microprocessor limitations of the claims at issue, without any support in the record for such a leap.  This leap was baseless and inconsistent with Alumot's teachings. These errors, separately or together, infected the basis for every challenged claim. Under the proper interpretation, Alumot does not suggest the training, modeling, or microprocessor limitations of the claims at issue.  Thus, Rudolph respectfully requests that this Court reverse the Board's obvious determinations and find the challenged claims patentable.

Respectfully submitted,
MERCHANT & GOULD P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2215
(612) 332-5300

Date:  July 13, 2015                    s/ Daniel W. McDonald
                                        Daniel W. McDonald

## <u>ADDENDUM</u>

| A Begin | A End | Date | Document(s) |
|:---:|:---:|:---:|---|
| A1 | A23 | 12/11/2014 | Decision on Appeal |
| A24 | A63 | 06/01/2010 | U.S. Patent No. 7,729,528 |



UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**U.S. Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO./ CONTROL NO. | FILING DATE | FIRST NAMED INVENTOR / PATENT IN REEXAMINATION | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 95/001,874 | 01/19/2012 | 7,729,528 | |

MERCHANT & GOULD PC
P.O. BOX 2903
MINNEAPOLIS, MN 55402-0903

| EXAMINER | |
|---|---|
| Hughes, Deandra | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/15/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

MOD PTOL-90A (Rev.06/08)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

RUDOLPH TECHNOLOGIES, INC.
Patent Owner, Appellant, and Cross-Respondent

v.

CAMTEK, LTD.
Requester, Respondent, and Cross-Appellant

———————

Appeal 2014-007999
*Inter Partes* Reexamination Control 95/001,874
United States Patent 7,729,528 B2
Technology Center 3900

———————

Before JOHN A. JEFFERY, STEPHEN C. SIU, and DAVID M. KOHUT,
*Administrative Patent Judges*.

JEFFERY, *Administrative Patent Judge*.

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

## DECISION ON APPEAL

Patent Owner appeals under 35 U.S.C. §§ 134 and 315 the Examiner's decision to reject claims 1–3, 6, 7, 9–11, 14, 17–19, 30–34, and 36. Requester cross-appeals the Examiner's decision declining to reject claims 4, 5, 8, 12, 13, 15, 16, 20–29, 35, and 37–53.

We have jurisdiction under 35 U.S.C. §§ 134 and 315, and we heard the appeal on December 3, 2014. We affirm-in-part, and newly reject claims 30–34 and 36 under 37 C.F.R. § 41.77(b).

## STATEMENT OF THE CASE

This proceeding arose from a request for *inter partes* reexamination filed on behalf of Requester, on January 19, 2012, of United States Patent 7,729,528 B2 ("the '528 patent"), issued to O'Dell on June 1, 2010.

The '528 patent describes an automated wafer defect inspection system. In one aspect, a computer system (1) develops a model of known good quality substrates, and (2) compares other substrates to the model to determine defects. *See generally* '528 patent, col. 7, ll. 1–54; col. 13, ll. 4–24; col. 16, ll. 38–45; Figs. 1–5. Claim 1 is illustrative of the invention and is reproduced below:

> 1. An automated system for inspecting a substrate, the system comprising:
> a wafer test plate;
> a substrate provider for providing a substrate to the test plate, wherein the substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, at least one portion of a patterned wafer, an individual die, at least one portion of an individual die, a plurality of individual die, at least one portion of a plurality of individual

2

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC
tray, and an Auer boat;

     a visual inspection device for visual inputting of a plurality of known
good quality substrates having a user defined level of quality during training
and for visual inspection of other unknown quality substrates during
inspection;

     an illuminator for providing short pulses of light to each of the
unknown quality substrates during movement between the substrate and the
visual inspection device; and

     a microprocessor having processing and memory capabilities for
developing a model of good quality substrate and comparing unknown
quality substrates to the model.

## RELATED PROCEEDINGS

This appeal is said to be related to various pending proceedings. In a
Notice of Concurrent Proceedings filed November 18, 2014, Patent Owner
cites two district court cases in connection with the '528 patent, one of
which is currently pending and stayed. In the same notice, Patent Owner
cites four cases in connection with U.S. Patent 6,826,298, the parent of the
'528 patent. One of those cases is a district court case, and the others
involve appeals to the U.S. Court of Appeals for the Federal Circuit. Two of
those three appeals (Nos. 2012-1681 and 2013-1023) were consolidated and
decided. *See August Tech. Corp. v. Camtek, Ltd.*, 542 Fed. Appx. 985 (Fed.
Cir. 2013) (unpublished). The other appeal (No. 2010-1458) has also been
decided. *See August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278 (Fed. Cir.
2011). *Accord* PO App. Br. 3, 44–45; TPR Resp. Br. 3; TPR App. Br. 3; PO
Resp. Br. 3 (citing similar cases in connection with related proceedings).[1]

---

[1] Throughout this opinion, we refer to (1) the Right of Appeal Notice mailed
February 1, 2013 ("RAN"); (2) Patent Owner's Appeal Brief filed April 30,
2013; (3) Requester's Respondent Brief filed May 28, 2013 ("TPR Resp.

3

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

## THE APPEALED REJECTIONS AND PROPOSED REJECTIONS

Patent Owner appeals the Examiner's rejecting the claims as follows:

Claims 1–3, 6, 7, 9–11, 14, and 17–19 under 35 U.S.C. § 103(a) as obvious over Alumot (US 5,982,921; Nov. 9, 1999) and Moriya (US 5,298,963; Mar. 29, 1994) ("Issues C, L, and P").[2]  RAN 6–9.[3]

Claims 30–34 and 36 under 35 U.S.C. § 102(b)[4] as anticipated by Alumot ("Issues A and Q").  RAN 9–11.

Requester cross-appeals the Examiner's not rejecting the claims as follows:

Claims 32, 33, 35, and 36 under 35 U.S.C. § 102(b) as anticipated by Moriya ("Issue B").

---

Br."); (4) the Examiner's Answer mailed July 31, 2013 ("Ans.") (incorporating the RAN by reference); (5) Requester's Cross-Appeal Brief filed May 10, 2013 ("TPR App. Br.); (6) Patent Owner's Respondent Brief filed June 10, 2013 ("PO Resp. Br."); and (7) Requester's Rebuttal Brief filed August 30, 2013 ("TPR Reb. Br.").

[2] For clarity, we refer to the letter-based issue identifiers used by the Examiner on page 6 of the Examiner's order granting/denying request for *inter partes* reexamination mailed March 26, 2012. *Accord* TPR App. Br. 8–10 (referring to these letter-based issue identifiers).

[3] Although the Examiner rejects three subsets of these claims separately as obvious over Alumot and Moriya, we nonetheless consolidate those rejections here for clarity and brevity.  We likewise do the same for the anticipation rejection.

[4] Alumot issued less than one year before the filing date of the parent '298 patent (April 29, 2000) of which the '528 patent is a continuation, and, therefore, does not technically qualify as prior art under § 102(b). Nevertheless, it is undisputed that Alumot otherwise qualifies as prior art; accordingly, we treat any error in this regard as harmless.

4

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

Claims 4, 5, 8, 12, 13, 15, 16, 20–29, 37–39, 41, and 43–53 under 35
U.S.C. § 103(a) as obvious over Alumot and Moriya ("Issues C, D, E, H, J,
L, M, N, O, and P").

Claims 40 and 42 under 35 U.S.C. § 103(a) as obvious over Alumot,
Moriya, and Kobayashi (US 5,245,671; Sept. 14, 1993) ("Issues F and G").

Claims 43–53 under 35 U.S.C. § 103(a) as obvious over Moriya
("Issues I and K").

## I. PATENT OWNER'S APPEAL
## THE EXAMINER'S OBVIOUSNESS REJECTION

Regarding independent claim 1, the Examiner finds that Alumot's
automated substrate inspection system includes, among other things, (1) a
visual inspection device for visual inputting plural known good quality
substrates having a user-defined level of quality during training, and (2) a
microprocessor having processing and memory capabilities for developing a
model of good quality substrate, and comparing unknown quality substrates
to the model. RAN 6. These features are said to be taught by the
functionality associated with Alumot's die-to-die comparison. RAN 3–6.
The Examiner also cites Moriya for teaching the recited illuminator, and
concludes that claim 1 would have been obvious over the cited references'
collective teachings. RAN 6. Requester concurs with these findings and
conclusions. *See* TPR Resp. Br. 6–14.

Patent Owner argues that Alumot's die-to-die comparison does not
train a model using plural known good quality substrates as claimed, but
rather uses a single die as a reference for a one-to-one comparison. PO App.

5

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

Br. 30–35. According to Patent Owner, the claim requires using multiple
images to train the model—a requirement that is said to be supported by the
District Court's interpretation of the term "training." PO App. Br. 33, 35.


## ISSUE

Under § 103, has the Examiner erred in rejecting claim 1 by finding
that Alumot and Moriya collectively would have taught or suggested an
automated substrate inspection system with a (1) visual inspection device for
visual inputting plural known good quality substrates having a user-defined
level of quality during training, and (2) microprocessor having processing
and memory capabilities for developing a model of good quality substrate,
and comparing unknown quality substrates to the model?


## ANALYSIS

*Claims 1–3, 6, and 7*

We begin by noting that, unlike independent claim 9, claim 1 does not
recite *training a model* using plural known good substrates as Patent Owner
contends. *See* PO App. Br. 31–35. Rather, claim 1 recites, in pertinent part,
(1) a visual inspection system for visual inputting plural known good quality
substrates during training, and (2) a microprocessor for developing a *model*
of good quality *substrate* and comparing unknown quality substrates to the
model. Although the microprocessor must be able to develop a model
according to the claim, the recited model is not tied directly to *plural* known
good quality substrates—a fact underscored by the singular term "substrate"
recited in connection with the model as noted above. Nor does claim 1 tie

6

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

the model to the training process associated with the visual inspection device's recited function.

The Federal Circuit's interpretation of a similar limitation reciting "visual inputting a plurality of known good quality *wafers* during training" is telling in this regard. *See August Tech.*, 655 F.3d at 1283 (emphasis added). There, the court noted that "[t]his limitation requires multiple good wafers to be used to train the *system*—so *the inspection device* will know a flawed wafer when it sees one." *Id.* (emphases added). Although the court found that multiple wafers are needed to train the *system*, the court did not state explicitly that they are needed to train the recited *model*, despite the claim at issue in that case having a microprocessor limitation similar to that at issue here, albeit in connection with provided wafers versus substrates in the present appeal.[5,6] Notably, the court's finding pertains explicitly to the *inspection device* identifying flawed wafers—not the microprocessor that develops the model and compares unknown quality wafers to the model in a manner similar to the recited microprocessor limitation at issue here. *See id.* Therefore, Patent Owner's contentions that claim 1 requires training a *model* are not commensurate with the scope of the claim.

_____

[5] Claim 1 in *August Tech.* recited, in pertinent part, (1) "a visual inspection device for visual inputting *a plurality of known good quality wafers* during training and for visual inspection of other unknown quality wafers during inspection," and (2) "a microprocessor having processing and memory capabilities for developing a model of good quality wafer, and comparing unknown quality wafers to the model." *August Tech.*, 655 F.3d at 1282.
[6] By the very terms of claim 1 in the present appeal, a "substrate" is a "wafer," for a "substrate" consists of, among other things, (1) a whole patterned wafer, (2) a sawn patterned wafer, (3) a broken patterned wafer, or (4) at least one portion of a patterned wafer.

7

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

But even if claim 1 required such training (which it does not), Alumot still at least suggests the functionality of the recited visual inspection device and microprocessor. We reach this conclusion even if we were to construe the term "training" as "examining substrates to develop a model of a good quality substrate" in a manner commensurate with Patent Owner's proffered definition of "training" in the context of wafers. *See* PO App. Br. 33, 35 (citing district court definition of "training" from related litigation).

Notably, it is undisputed that Alumot compares one die's pattern, serving as the inspected pattern, with light pattern of *at least one* other die, serving as a reference pattern, to determine the likelihood of a defect being present in the inspected pattern. PO App. Br. 34 (citing Alumot, col. 8, ll. 36–43); TPR Resp. Br. 8–9 (same). *Accord* RAN 6 (citing Alumot col. 8, ll. 36–43 in connection with the disputed visual inspection device and microprocessor limitations).

Although Patent Owner and Requester acknowledge that Alumot's comparing one die's pattern with a light pattern of *at least one* other die can involve multiple dies, both parties interpret this multi-die comparison differently. According to Patent Owner, Alumot suggests multiple one-to-one die comparisons when considered in light of Alumot's passage in column 9, lines 3 to 10. PO App. Br. 34. Requester, however, interprets Alumot as teaching an approach where one *or more* light patterns can serve as a reference pattern that is compared with the inspected die. TPR Resp. Br. 9.

Despite these divergent views of Alumot's multi-die comparison, when considered in context of the various cited passages, Alumot does not

8

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

indicate clearly whether this multi-die comparison involves (1) multiple one-to-one die comparisons as Patent Owner contends, or (2) comparing multiple patterns collectively to an inspected die as Requester contends. At best, the passage is ambiguous in this regard.

Nevertheless, even assuming, without deciding, that Alumot contemplates multiple one-to-one die comparisons as Patent Owner argues, Alumot at least suggests the other alternative, namely comparing multiple patterns collectively to an inspected die under Requester's interpretation. That is, skilled artisans would understand that there are only two possibilities to compare a die's pattern with that of multiple other dies in Alumot: the comparison is either done *individually* on a die-by-die basis (i.e., multiple one-to-one comparisons) or *collectively* (i.e., plural-to-one comparison). Given these two possibilities, we find that the weight of the evidence on this record favors the Examiner's and Requester's position, at least to the extent that Alumot at least suggests that training a model with plural known good quality substrates, where the model is used as a basis for comparison, would have at least been an obvious variation given Alumot's multi-die comparison. We reach the same conclusion regarding the functionality of the visual inspection device and microprocessor recited in claim 1 even assuming, without deciding, that the recited model that the microprocessor develops is trained using plural known good quality substrates under Patent Owner's interpretation.

Therefore, we are not persuaded that the Examiner erred by rejecting claim 1 as obvious over Alumot and Moriya, and dependent claims 2, 3, 6, and 7 not argued separately with particularity.

9

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

### *Claims 9–11, 14, and 17–19*

We also sustain the Examiner's obviousness rejection of claims 9–11, 14, and 17–19 over Alumot and Moriya. RAN 7–9. Despite nominally arguing these claims separately, Patent Owner reiterates similar arguments made in connection with claim 1 that we find unpersuasive for the reasons previously discussed. *See* PO App. Br. 36.

Furthermore, Patent Owner's arguments regarding the cited prior art allegedly not including a controller for comparing pixel data for unknown quality substrates to a model of a good quality substrate in connection with independent claim 14 are unavailing and not commensurate with the scope of the claim for an additional reason. As Requester indicates, claim 14 recites nothing concerning forming a reference model through training using multiple known quality substrates, let alone training a model using multiple real images from such substrates. TPR Resp. Br. 6, 13, 15 (noting these points). Accordingly, Patent Owner's arguments regarding claims 14 and 17–19 are likewise unpersuasive for this additional reason.

JA0011

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

THE EXAMINER'S ANTICIPATION REJECTION

*Claims 30 and 31*

We will not, however, sustain the Examiner's anticipation rejection of independent claim 30 reciting, in pertinent part, creating a reference model based on first and second images collected from respective reference known quality substrates.

The Examiner finds that Alumot collects first and second images collected from respective reference known quality substrates, citing identical passages from Alumot for teaching these image-collection limitations. RAN 9–10 (citing Alumot, col. 8, ll. 36–52; col. 24, ll. 7–17). As noted above, the cited passage from Alumot's column eight pertains to a *die-to-die comparison* where one die's pattern, serving as the inspected pattern, is compared with the light pattern of at least one other die, serving as a reference pattern, to determine the likelihood of a defect being present in the inspected pattern. *See* Alumot, col. 8, ll. 36–52.

But the cited passage from Alumot's column 24 does not pertain to a *die-to-die* comparison, but rather to a *repetitive-pattern* comparison, namely comparing repetitive pattern units on the same die or different article. *See* Alumot, col. 24, ll. 1–17; col. 27, ll. 45–51 (distinguishing data generated from real images in another like article in the die-to-die comparison from another like pattern in the same article in the repetitive-pattern comparison). *Accord* Request filed Jan. 19, 2012 ("Request"), at 134–135 (citing Alumot's repetitive-pattern comparison in connection with the image collection limitations).

11

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

The Examiner's reliance on two different types of comparisons in Alumot to teach the same image collection elements in claim 30 is problematic for anticipation which must disclose *necessarily* the elements arranged as claimed. *See Net MoneyIn, Inc. v. Verisign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008); *see also id.* at 1371 (noting that it is insufficient for anticipation for a cited prior art reference to include multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention). *Id.* at 1371. The Examiner's reliance on these different embodiments also conflicts with the Examiner's exclusive reliance on Alumot's die-to-die comparison—not the repetitive-pattern comparison. *See* RAN 3–4 ("[T]he 'repetitive pattern' comparison and the 'die-to-database' comparison use synthetic images . . . . 'Die-to-die' comparison, however, uses real images and as such, *the response to arguments set forth in this action will be limited to 'die-to-die' comparison, which is the basis of the rejections at issue*.") (emphasis added).

But leaving these inconsistencies aside, we also find problematic the Examiner's reliance on Alumot's column 8, lines 36 to 43 for *necessarily* creating a reference model based on the first and second images as claimed. As noted previously, Alumot does not indicate clearly whether the multi-die comparison in this passage involves (1) multiple one-to-one die comparisons as Patent Owner contends, or (2) comparing multiple patterns collectively to an inspected die as Requester contends. At best, the passage is ambiguous in this regard. Although creating a model based on two images would have been obvious from this passage as noted above and as indicated in our new ground of rejection, *infra*, we cannot say that the cited passages *necessarily*

12

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

disclose that feature—a crucial requirement for inherent anticipation. *See In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) ("Inherency . . . may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.") (citations omitted). Patent Owner's contention that Alumot does not create a model based on two images (PO App. Br. 37) are, therefore, persuasive to the extent that Alumot does not *necessarily* disclose that feature.

Accordingly, we are persuaded that the Examiner erred in rejecting independent claim 30 as anticipated by Alumot, and dependent claim 31 for similar reasons.

### *Claims 32–34*

We also do not sustain the Examiner's rejection of independent claim 32 reciting, in pertinent part, a means for comparing the captured images to a reference model to detect defects in the substrate. RAN 12. As Patent Owner indicates (PO App. Br. 37), this means-plus-function limitation must be construed to cover the corresponding structure in the Specification and its equivalents. *See In re Donaldson Co., Inc.*, 16 F.3d 1189, 1193 (Fed. Cir. 1994) (en banc). Citing various passages from the '528 patent's Specification, Patent Owner construes the recited "means for comparing" to a computer system having a processor and memory capabilities for (1) saving the inputted good die, (2) developing a model therefrom, and (3) comparing or analyzing other die in comparison to the model. PO App. Br. 37 (citing Spec. 7:13–18; 16:38–45). *Accord* Request, at 52 (citing Spec. 7:13–17 in connection with the recited means for comparing limitation).

13

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

In light of this acknowledged corresponding structure, we find the
Examiner's position problematic to the extent that Alumot's computer
system does not *necessarily* disclose this corresponding structure or its
equivalents. As noted above, a key aspect of the '528 patent's computer
system is its capability to develop a model from saved inputted good die.
*See* Spec. 7:13–18. Notably, this inputted good die must be *at least two*
such die to create the model. *See* Spec. 13:13–19 (noting that although no
minimum or maximum number good die is required to create a model,
"definitionally" at least two such die are required).

Although the claim recites a means for comparing captured images to
*a reference model* as Requester indicates (TPR Resp. Br. 6, 16), the
corresponding structure to this comparing means nonetheless requires saving
at least two images and deriving the reference model from those images. As
such, we find that Alumot does not *necessarily* disclose that feature for the
reasons noted above; accordingly, we find Patent Owner's contentions
persuasive to that extent.

Therefore, we are persuaded that the Examiner erred in rejecting
claim 32 as anticipated by Alumot, and dependent claims 33, 34, and 36 for
similar reasons.

## II. NEW GROUNDS OF REJECTION

We newly reject claims 30–34 and 36 under § 103(a) as obvious over
Alumot.

Regarding claims 30 and 31, we adopt the Examiner's undisputed
findings regarding Alumot's die-to-die comparison as teaching or suggesting

14

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

all recited elements. *See* RAN 9–10. Although Alumot's column 8, lines 36 to 43 does not *necessarily* create a reference model based on the first and second images as recited in claim 30, it nonetheless at least suggests as much. As noted previously, Alumot's column 8, lines 36 to 43 indicates that one die's pattern is compared with the light pattern of *at least one* other die serving as the reference pattern. In light of the multi-die comparison in this passage, creating a model based on two images would have been at least an obvious variation for the reasons indicated previously.

Regarding claims 32–34 and 36, we adopt the Examiner's undisputed findings regarding Alumot's die-to-die comparison as teaching or suggesting all recited elements. *See* RAN 11. We also adopt Patent Owner's construction of the recited "means for comparing" as a computer system having a processor and memory capabilities for (1) saving the inputted good die, (2) developing a model therefrom, and (3) comparing or analyzing other die in comparison to the model. PO App. Br. 37 (citing Spec. 7:13–18; 16:38–45). *Accord* Request, at 52 (citing Spec. 7:13–17 in connection with the recited means for comparing limitation).

As noted above, a key aspect of the '528 patent's computer system is its capability to develop a model from saved inputted good die. *See* Spec. 7:13–18. Notably, this inputted good die must be *at least two* such die to create the model. *See* Spec. 13:13–19 (noting that although no minimum or maximum number good die is required to create a model, "definitionally" at least two such die are required).

Although the claim recites a means for comparing captured images to *a reference model* as Requester indicates (TPR Resp. Br. 6, 16), the

15

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

corresponding structure to this comparing means nonetheless requires saving
at least two images and deriving the reference model from those images.
Although Alumot does not necessarily disclose that feature as noted above,
we nonetheless find that Alumot at least suggests as much, particularly in
view of the multi-die comparison described in Alumot's column 8, lines 36
to 43 noted above.

## III. THE CROSS-APPEAL

As noted above, Requester cross-appeals the Examiner's not rejecting
the claims as follows:

Claims 32, 33, 35, and 36 under 35 U.S.C. § 102(b) as anticipated by
Moriya ("Issue B").

Claims 4, 5, 8, 12, 13, 15, 16, 20–29, 37–39, 41, and 43–53 under 35
U.S.C. § 103(a) as obvious over Alumot and Moriya ("Issues C, D, E, H, J,
L, M, N, O, and P").

Claims 40 and 42 under 35 U.S.C. § 103(a) as obvious over Alumot,
Moriya, and Kobayashi ("Issues F and G").

Claims 43–53 under 35 U.S.C. § 103(a) as obvious over Moriya
("Issues I and K"). TPR App. Br. 8–10.

The Examiner, however, denied reexamination with respect to these
particular grounds and issues, finding that the reexamination request did not
establish a reasonable likelihood that Requester would prevail (RLP) with
respect to claims 4, 5, 8, 12, 13, 15, 16, 20–29, 35, and 37–53.[7] Order

---

[7] Specifically, the Examiner found that the request established an RLP with
respect to claims 1–3, 6, 7, 9–11, 14, 17–19, 30–34, and 36 of the '528

16

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

Granting/Denying Request for *Inter Partes* Reexamination, mailed Mar. 26, 2012 ("Reexam. Order"), at 2, 6–7.

Requester then petitioned to order reexamination of these claims, seeking supervisory review of the Examiner's order denying the reexamination request for these claims. Petition filed Apr. 13, 2012. Ten months later, Requester filed another petition requesting the Office decide the first petition. Petition filed Feb. 13, 2013. The present cross-appeal followed these petitions, Requester filing a notice of cross-appeal on March 13, 2013 and cross-appeal brief on May 10, 2013, and Patent Owner filing a respondent brief on June 10, 2013.

About two weeks later, Requester's first petition was denied, and the second petition dismissed as moot in view of this denial. *See* Decision on Petition Under 37 C.F.R. 1.927 and 1.181 mailed June 25, 2013 ("June 2013 Petition Decision"); Decision Dismissing Petition Filed Under 37 C.F.R. § 1.182 mailed July 8, 2013. On August 30, 2013, Requester filed a rebuttal brief.

Despite acknowledging that determinations by the USPTO Director to deny reexamination are final and non-appealable under 35 U.S.C. § 312(c), Requester contends that because the first petition was not decided before filing the Notice of Cross-Appeal, there was no final and non-appealable

---

patent, but failed to establish an RLP with respect to claims 4, 5, 8, 12, 13, 15, 16, 20–29, 35, and 37–53. Reexam. Order at 2. Although the Examiner's summary of the claims where Requester failed to establish an RLP omits claims 32, 33, and 36, the Examiner nonetheless found that Requester failed to establish an RLP with respect to these claims regarding the proposed anticipation rejection over Moriya ("Issue B"). Reexam. Order at 6.

17

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

decision at that time. TPR App. Br. 10–11; TPR Reb. Br. 2–4. As such, Requester reasons, the Board was the only opportunity to review the Examiner's decision not to reject the claims as proposed. *See id.*

Requester's reasoning is unpersuasive. First, merely because a pending petition has not yet been decided when an appeal is filed does not automatically transform a petitionable matter into an appealable matter. Nor has Requester provided any authority to support such a proposition. As Patent Owner indicates (PO Resp. Br. 8), any remedy for such petitionable matters is with the Director—not the Board. *See* MPEP § 1201 ("The Board will not ordinarily hear a question that should be decided by the Director on petition, and the Director will not ordinarily entertain a petition where the question presented is a matter appealable to the Board.").

Simply put, there is no final decision favorable to patentability for Requester to appeal; as such, we lack jurisdiction to decide such issues. *See* 35 U.S.C. §§ 134(c); 312(c); *see also* 37 C.F.R. §§ 41.61(c), 1.927. It is well settled that "the Director's determination that an issue does not raise a substantial new question of patentability is not a decision favorable to patentability. Lack of a substantial new question of patentability is not a favorable decision on patentability." *Belkin Int'l, Inc. v. Kappos*, 696 F.3d 1379, 1383 (Fed. Cir. 2012). This is because "the decision on the substantial new question preceded the actual reexamination, and merely raised a 'question' to be answered." *Id.* Although this holding applies to the former substantial new question of patentability standard for instituting reexamination, it nonetheless applies equally to the newer RLP standard, for the RLP determination likewise precedes reexamination.

18

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

To be sure, the Examiner's determination refusing to order *inter partes* reexamination is final and nonappealable if (1) no petition is filed, or (2) the petition decision affirms that an RLP was not established—neither of which was satisfied when the notice of cross-appeal was filed as Requester indicates. TPR Reb. Br. 2 (citing 37 C.F.R. § 1.927). We further recognize that the Requester in *Belkin* did not file a petition, unlike Requester here. TPR Reb. Br. 3 (citing *Belkin*, 696 F.3d at 1385). Nevertheless, the fact remains that the Examiner's denying reexamination with respect to the particular grounds and issues noted above is not a favorable patentability decision appealable to this Board, despite an associated undecided petition when the cross-appeal was filed. That this petition was later denied in all respects only underscores the lack of a favorable patentability decision appealable to this Board. *See* June 2013 Petition Decision.

Because we lack jurisdiction to decide the grounds and issues raised in Requester's cross-appeal, we need not address their merits.

CONCLUSION

Under § 103, the Examiner did not err in rejecting claims 1–3, 6, 7, 9–11, 14, and 17–19. The Examiner, however, erred in rejecting claims 30–34 and 36 under § 102. Accordingly, the Examiner's decision rejecting claims 1–3, 6, 7, 9–11, 14, 17–19, 30–34, and 36 is affirmed-in-part.

We newly reject claims 30–34 and 36 under § 103.

We lack jurisdiction to decide the cross-appeal.

19

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

DECISION

The Examiner's decision rejecting claims 1–3, 6, 7, 9–11, 14, 17–19, 30–34, and 36 is affirmed-in-part, and we newly reject claims 30–34 and 36 under § 103.

Under 37 C.F.R. § 41.77(b), our decision includes a new ground of rejection. That section provides that "a new ground of rejection . . . shall not be considered final for judicial review." That section also provides that Patent Owner, WITHIN ONE MONTH FROM THE DATE OF THE DECISION, must exercise one of the following two options with respect to the new grounds of rejection to avoid termination of the appeal proceeding as to the rejected claims:

> (1) Reopen prosecution. The owner may file a response requesting reopening of prosecution before the examiner. Such a response must be either an amendment of the claims so rejected or new evidence relating to the claims so rejected, or both.

> (2) Request rehearing. The owner may request that the proceeding be reheard under § 41.79 by the Board upon the same record. The request for rehearing must address any new ground of rejection and state with particularity the points believed to have been misapprehended or overlooked in entering the new ground of rejection and also state all other grounds upon which rehearing is sought.

In accordance with 37 C.F.R. § 41.79(a)(1), the "[p]arties to the appeal may file a request for rehearing of the decision within one month of the date of . . . [t]he original decision of the Board under § 41.77(a)." A request for rehearing must be in compliance with 37 C.F.R. § 41.79(b). Comments in opposition to the request and additional requests for rehearing

20

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

must be in accordance with 37 C.F.R. § 41.79(c)-(d), respectively.  Under 37
C.F.R. § 41.79(e), the time periods for requesting rehearing under paragraph
(a) of this section, for requesting further rehearing under paragraph (c) of
this section, and for submitting comments under paragraph (b) of this section
may not be extended.

An appeal to the United States Court of Appeals for the Federal
Circuit under 35 U.S.C. §§ 141-44 and 315 and 37 C.F.R. § 1.983 for an
*inter partes* reexamination proceeding "commenced" on or after November
2, 2002 may not be taken "until all parties' rights to request rehearing have
been exhausted, at which time the decision of the Board is final and
appealable by any party to the appeal to the Board."  37 C.F.R. § 41.81.  *See
also* MPEP § 2682.

No time period for taking any subsequent action in connection with
this appeal may be extended under 37 C.F.R. § 1.136(a).

<u>AFFIRMED-IN-PART</u>
<u>37 C.F.R. § 41.77</u>

alw

21

Appeal 2014-007999
Reexamination Control 95/001,874
Patent US 7,729,528

Patent Owner:

Merchant & Gould PC
P.O. Box 2903
Minneapolis, MN 55402-0903

Third-Party Requester:

Kevin C. Amendt
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111

22



US007729528B2

(12) **United States Patent**     (10) **Patent No.:**    **US 7,729,528 B2**
O'Dell et al.               (45) **Date of Patent:**    ***Jun. 1, 2010**

(54) **AUTOMATED WAFER DEFECT INSPECTION SYSTEM AND A PROCESS OF PERFORMING SUCH INSPECTION**

(75) Inventors: **Jeffrey O'Dell**, Deephaven, MN (US); **Thomas Verburgt**, Eden Prairie, MN (US); **Mark Harless**, New Hope, MN (US); **Cory Watkins**, Ramsey, MN (US)

(73) Assignee: **Rudolph Technologies, Inc.**, Flanders, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1451 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/915,666**

(22) Filed: **Aug. 10, 2004**

(65) **Prior Publication Data**

US 2005/0008218 A1    Jan. 13, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 09/562,273, filed on Apr. 29, 2000, now Pat. No. 6,826,298.

(60) Provisional application No. 60/092,923, filed on Jul. 15, 1998, provisional application No. 60/092,701, filed on Jul. 14, 1998.

(51) **Int. Cl.**
   *G06K 9/00*      (2006.01)
   *G01N 21/86*     (2006.01)
   *G01V 8/00*      (2006.01)

(52) **U.S. Cl.** .................................. **382/149**; 250/559.39

(58) **Field of Classification Search** ................. 382/141, 382/145, 147, 148, 149, 181; 348/87, 126; 356/237.3, 237.4, 237.5; 438/16; 250/559.39
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,963,354 | A | 6/1976 | Feldman et al. |
| 4,037,941 | A | 7/1977 | Belleson et al. |
| 4,131,803 | A | 12/1978 | Takematsu et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

JP      51-137379      11/1976

(Continued)

OTHER PUBLICATIONS

August Technology, "*NSX-80 Market Specifications and Top Potential Customers*," 3 pgs, (Sep. 5, 1996).

(Continued)

*Primary Examiner*—John B Strege
(74) *Attorney, Agent, or Firm*—Dicke, Billig & Czaja, PLLC

(57) **ABSTRACT**

An automated defect inspection system has been invented and is used on patterned wafers, whole wafers, broken wafers, partial wafers, sawn wafers such as on film frames, JEDEC trays, Auer boats, die in gel or waffle packs, MCMs, etc. and is specifically intended and designed for second optical wafer inspection for such defects as metalization defects (such as scratches, voids, corrosion, and bridging), diffusion defects, passivation layer defects, scribing defects, glassivation defects, chips and cracks from sawing, solder bump defects, and bond pad area defects.

**53 Claims, 19 Drawing Sheets**



US 7,729,528 B2

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,136,930 A | 1/1979 | Gomm et al. |
| 4,143,770 A | 3/1979 | Grimmell et al. |
| 4,146,135 A | 3/1979 | Sarkar et al. |
| 4,148,065 A | 4/1979 | Nakagawa et al. |
| 4,162,126 A | 7/1979 | Nakagawa et al. |
| 4,185,298 A | 1/1980 | Billet et al. |
| 4,209,257 A | 6/1980 | Uchiyama et al. |
| 4,223,346 A | 9/1980 | Neiheisel et al. |
| 4,240,750 A | 12/1980 | Kurtz et al. |
| 4,246,098 A | 1/1981 | Conway et al. |
| 4,247,203 A | 1/1981 | Levy et al. |
| 4,284,357 A | 8/1981 | Kudo |
| 4,311,427 A | 1/1982 | Coad et al. |
| 4,328,553 A | 5/1982 | Fredriksen et al. |
| 4,376,583 A | 3/1983 | Alford et al. |
| 4,377,340 A | 3/1983 | Green et al. |
| 4,378,159 A | 3/1983 | Galbraith |
| 4,464,705 A | 8/1984 | Horowitz |
| 4,500,202 A | 2/1985 | Smyth |
| 4,513,316 A | 4/1985 | Kobayashi et al. |
| 4,527,070 A | 7/1985 | Matsui et al. |
| 4,532,650 A | 7/1985 | Wihl et al. |
| 4,542,404 A | 9/1985 | Duschl |
| 4,556,317 A | 12/1985 | Sandland et al. |
| 4,578,810 A | 3/1986 | MacFarlane et al. |
| 4,601,577 A | 7/1986 | Gotou et al. |
| 4,618,938 A | 10/1986 | Sandland et al. |
| 4,626,101 A | 12/1986 | Ogawa et al. |
| 4,639,587 A | 1/1987 | Chadwick et al. |
| 4,641,966 A | 2/1987 | Lemmers et al. |
| 4,644,172 A | 2/1987 | Sandland et al. |
| 4,648,053 A | 3/1987 | Fridge |
| 4,659,220 A | 4/1987 | Bronte et al. |
| 4,691,231 A | 9/1987 | Fitzmorris et al. |
| 4,695,215 A | 9/1987 | Jacoby et al. |
| 4,731,855 A | 3/1988 | Suda et al. |
| 4,740,708 A | 4/1988 | Batchelder |
| 4,764,969 A | 8/1988 | Ohtombe et al. |
| 4,776,022 A | 10/1988 | Fox et al. |
| 4,799,175 A | 1/1989 | Sano et al. |
| 4,805,123 A | 2/1989 | Specht et al. |
| 4,806,774 A | 2/1989 | Lin et al. |
| 4,812,664 A | 3/1989 | Borden |
| 4,816,116 A | 3/1989 | Davis et al. |
| 4,816,686 A | 3/1989 | Hara et al. |
| 4,818,110 A | 4/1989 | Davidson |
| 4,820,932 A | 4/1989 | Miller |
| 4,823,394 A | 4/1989 | Berkin et al. |
| 4,845,558 A | 7/1989 | Tsai et al. |
| 4,859,863 A | 8/1989 | Schrader et al. |
| 4,877,326 A | 10/1989 | Chadwick et al. |
| 4,898,471 A | 2/1990 | Stonestrom et al. |
| 4,926,489 A | 5/1990 | Danielson et al. |
| 4,942,618 A | 7/1990 | Sumi et al. |
| 4,969,198 A | 11/1990 | Batchelder et al. |
| 4,992,949 A | 2/1991 | Arden |
| 5,030,008 A | 7/1991 | Scott et al. |
| 5,032,734 A | 7/1991 | Orazio, Jr. et al. |
| 5,058,178 A | 10/1991 | Ray |
| 5,076,692 A | 12/1991 | Neukermans et al. |
| 5,085,517 A | 2/1992 | Chadwick et al. |
| 5,091,963 A | 2/1992 | Litt et al. |
| 5,095,204 A | 3/1992 | Novini |
| 5,105,147 A | 4/1992 | Karasikov et al. |
| 5,120,126 A | 6/1992 | Wertz et al. |
| 5,131,755 A | 7/1992 | Chadwick et al. |
| 5,153,668 A | 10/1992 | Katzir et al. |
| 5,177,559 A | 1/1993 | Batchelder et al. |
| 5,195,451 A | 3/1993 | Takatori et al. |
| 5,274,434 A | 12/1993 | Morioka et al. |
| 5,276,498 A | 1/1994 | Galbraith et al. |
| 5,293,538 A | 3/1994 | Iwata et al. |
| 5,298,963 A | 3/1994 | Moriya et al. |
| 5,311,598 A | 5/1994 | Bose et al. |
| 5,355,212 A | 10/1994 | Wells et al. |
| 5,440,648 A | 8/1995 | Roberts et al. |
| 5,455,870 A | 10/1995 | Sepai et al. |
| 5,497,381 A | 3/1996 | O'Donoghue et al. |
| 5,506,676 A | 4/1996 | Hendler et al. |
| 5,513,275 A | 4/1996 | Khalaj et al. |
| 5,517,234 A | 5/1996 | Gerber et al. |
| 5,537,669 A | 7/1996 | Evans et al. |
| 5,544,256 A | 8/1996 | Brecher et al. |
| 5,572,256 A | 11/1996 | Egawa et al. |
| 5,586,058 A | 12/1996 | Aloni et al. |
| 5,604,585 A | 2/1997 | Johnson et al. |
| 5,619,429 A | 4/1997 | Aloni et al. |
| 5,640,200 A | 6/1997 | Michael |
| 5,641,960 A | 6/1997 | Okubo et al. |
| 5,699,447 A | 12/1997 | Alumot et al. |
| 5,717,518 A | 2/1998 | Shafer et al. |
| 5,737,072 A | 4/1998 | Emery et al. |
| 5,768,443 A | 6/1998 | Michael et al. |
| 5,787,190 A | 7/1998 | Peng et al. |
| 5,805,123 A | 10/1998 | Specht et al. |
| 5,822,055 A | 10/1998 | Tsai et al. |
| 5,825,483 A | 10/1998 | Michael et al. |
| 5,850,466 A | 12/1998 | Schott |
| 5,854,674 A | 12/1998 | Lin |
| 5,856,844 A | 1/1999 | Battermann et al. |
| 5,859,698 A | 1/1999 | Chau et al. |
| 5,859,923 A | 1/1999 | Petry, III et al. |
| 5,880,772 A | 3/1999 | Kalnajs et al. |
| 5,892,579 A | 4/1999 | Elyasaf et al. |
| 5,912,964 A | 6/1999 | Stelman |
| 5,913,105 A | 6/1999 | McIntyre et al. |
| 5,917,588 A | 6/1999 | Addiego |
| 5,923,430 A | 7/1999 | Worster et al. |
| 5,949,901 A | 9/1999 | Nichani et al. |
| 5,956,174 A | 9/1999 | Shafer et al. |
| 5,973,776 A | 10/1999 | Matsushita |
| 5,978,061 A | 11/1999 | Miyazaki et al. |
| 5,982,921 A | 11/1999 | Alumot et al. |
| 6,078,386 A | 6/2000 | Tsai et al. |
| 6,084,716 A | 7/2000 | Sanada et al. |
| 6,096,031 A | 8/2000 | Mitchell et al. |
| 6,122,397 A | 9/2000 | Lee et al. |
| 6,167,148 A | 12/2000 | Calitz et al. |
| 6,178,257 B1 | 1/2001 | Alumot et al. |
| 6,192,289 B1 | 2/2001 | Geffen et al. |
| 6,259,827 B1 | 7/2001 | Nichani |
| 6,324,298 B1 | 11/2001 | O'Dell et al. |
| 6,366,690 B1 | 4/2002 | Smilansky et al. |
| 6,448,549 B1 | 9/2002 | Safaee-Rad |
| 6,522,777 B1 | 2/2003 | Paulsen et al. |
| 6,826,298 B1 | 11/2004 | O'Dell et al. |
| 6,934,019 B2 | 8/2005 | Geffen et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 62220839 | 9/1987 |
| JP | 63058138 | 3/1988 |
| JP | 04104043 | 4/1992 |
| JP | 04348050 | 12/1992 |
| JP | H4-348050 | 12/1992 |
| JP | 05218160 | 8/1993 |
| JP | 05281151 | 10/1993 |
| JP | 06036016 | 2/1994 |

OTHER PUBLICATIONS

August Technology, "*NSX-80 Automated Wafer & Die Defect Inspection System (2nd Optical)*," 21 pgs., (Mar. 1997).

**US 7,729,528 B2**

Page 3

Photonics Systems Group Automation Technology Division, *SIMTech Technical Report (AT/01/038/PS)* "*Development of Automated Wafer Bump Inspection Technology,*" 7 pgs. (2001).

B.B. Weiner et al., "*Improvements in Accuracy and Speed Using the Time-of-Transition Method and Dynamic Image Analysis for Particle Sizing,*" 17 pgs. (1998).

Inspection, Metrology and Data Analysis Solutions for Wafer Manufacturing and Final Processing, "*August Technology Introduces Automated 2nd Optical Wafer & Die Inspection System,*" 1 pg., San Jose, CA (Jul. 16, 1997).

Yasuyuki Wakisaka et al., "*Special Introduction of New Process and New Materials and Semiconductor Manufacturing Device Wafer Pattern Inspection Device 'Inspectra'*" pp. 107-110 (Mar. 1996).

Solid State Technology, "*Solid State,*"Worldwide Semiconductor Production, A PennWell Publication, 6 pgs. (Jun. 1993).

IECON'91, 1991 International Conference on Industrial Electronics, Control and Instrumentation, "*Computer Based Wafer Inspection System,*" 9 pgs. (Oct. 28-Nov. 1, 1991).

Solid State Technology, "*Solid State, Automated Optical Inspection and Test of Active Matrix Liquid Crystal Arrays,*" 6 pgs. (Apr. 1995).

Camtek Ltd.'s Prior Art Statement, U.S. District Court, District of Minnesota, Case No. 05-CV 1396 (MJD/AJB), 48 pgs. (Jul. 7, 2006).

Pleading Inventory for Case No. 05-CV-1396 as of Aug. 18, 2006, Pleading Index No. 1 through Pleading Index No. 13 listing items 1-241.

Dralla, John, "*Wafer inspection—past, present and future,*" Electronics Manufacture & Test, pp. 21-24 (May 1990).

Dralla, John and Hoff, John, "*Automatic classification of defects in semiconductor devices,*" SPIE vol. 1261 Integrated Circuit Metrology, Inspection, and Process Control IV, pp. 173-182 (1990).

Complaint filed in the United States District Court for the District of Minnesota on Jul. 13, 2005, Civil Action No. 0:05-cv-01396.

*August Technology Corporation* v. *Camtek Ltd.*, Plantiff's Complaint, filed Jul. 14, 2005; 5 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Exhibit A to Complaint, filed Jul. 14, 2005; 31 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek Ltd.'s Responses and Objections to August Technology Corp.'s First Set of Requests for Production of Documents and Things, filed Oct. 28, 2005; 13 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Defendant Camtek Ltd.'s Responses and Objections to August Technology Corp.'s First Set of Interrogatories, filed Oct. 28, 2005; 14 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Memorandum & Order, filed Dec. 2, 2005; 11 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Defendant's Responses to Plaintiff's First Set of Interrogatories, filed Dec. 19, 2005; 9 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Defendant's Responses to Plaintiffs First Set of Requests for the Production of Documents and Things, filed Dec. 19, 2005; 14 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Answer and Counterclaim of Camtek Ltd. in Response to Complaint of August Technology Corporation, filed Dec. 22, 2005; 9 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Responses to Defendant's First Request for the Production of Documents and Things, filed Jan. 6, 2006; 20 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Responses to Defendant's First Set of Interrogatories, filed Jan. 6, 2006; 6 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Reply to Counterclaim, filed Jan. 11, 2006; 3 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek's Responses and Objections to August's Second set of Requests for Production (Nos. 15-33) filed Apr. 3, 2006; 16 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek's Opposition to August's Motion to Compel Discovery filed Apr. 6, 2006; 15 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Amended Complaint and Jury Demand and Exhibit A filed Apr. 12, 2006; 37 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Answer and Counterclaim of Camtek Ltd. in Response to Amended Complaint of August Technology Corporation and Rudolph Technologies, Inc. filed May 1, 2006; 11 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Reply to Defendant's Counterclaim filed May 24, 2006; 4 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, August's Responses to Defendant's Second Request to August Technologies for the Production of Documents and Things (Nos. 41-93) filed Jun. 14, 2006; 22 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Rudolph's Responses to Defendant's First Request to Rudolph Technologies for the Production of Documents and Things (Nos. 1-90) filed Jun. 14, 2006; 35 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Defendant Camtek Ltd.'s Response and Objections to Plaintif's Third Set of Requests for the Production of Documents and Things (Nos. 34-48) filed Jun. 26, 2006; 14 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Defendant Camtek Ltd.'s Response and Objections to Plaintiff's First Set of Admissions (1-66) filed Jun. 30, 2006; 57 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff August Technology Corporation's Amended Response to Defendant's Interrogatory No. 1 filed Jul. 13, 2006; 4 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Disputed Claim Terms and Phrases filed Aug. 4, 2006; 10 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Joint Claim Construction Statement filed Aug. 4, 2006; 4 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Prior Art Statement filed Aug. 4, 2006; 24 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Order filed Aug. 24, 2006; 6 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek Ltd.'s Opening Claim Construction Brief filed Sep. 12, 2006; 29 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Opening Claim Construction Brief filed Sep. 12, 2006; 34 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Supplemental Joint Claim Construction Statement filed Sep. 12, 2006; 12 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek Ltd.'s Amended Responses to Plaintiff's Requests for Admission Nos. 35-37 filed Sep. 26, 2006; 7 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Rebuttal Claim Construction Brief filed Oct. 6, 2006; 10 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Amended Answer and Counterclaim of Camtek Ltd. in Response to Amended Complaint of August Technology Corporation and Rudolph Technologies, Inc. filed Nov. 17, 2006; 14 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Responses to Camtek Ltd.'s First Set of Interrogatories for Admission to Plaintiffs (Nos. 1-47) filed Nov. 17, 2006; 23 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Responses to Defendant's Interrogatories Nos. 7-17 filed Nov. 20, 2006; 9 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Defendant Camtek Ltd.'s Response and Objections to Plaintiff's Fifth Set of Requests for the Production of Documents and Things (Nos. 90-110) filed Dec. 4, 2006; 19 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Defendant Camtek Ltd.'s Response and Objections to Plaintiff's Sixth Set of Requests for the Production of Documents and Things (Nos. 111-116) filed Dec. 11, 2006; 10 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Second Amended Answer and Counterclaim of Camtek Ltd. in Response to Amended Complaint of August Technology Corporation and Rudolph Technologies, Inc., filed Dec. 15, 2006; 14 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Defendant Camtek Ltd.'s Response and Objections to Plaintiff's Third Set of Requests for Admission (115-161) filed Dec. 18, 2006; 23 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Amended Responses to Camtek Ltd.'s First Set of Requests for Admission to Plaintiffs filed Dec. 18, 2006; 15 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek's Ltd.'s Amended Responses to Plaintiff's Requests for Admission (Nos. 3-5, 9-16, 22-28, 33-34, 38, 40-45, 51-54) filed Dec. 18, 2006; 42 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Defendant Camtek Ltd.'s Response and Objections to Plaintiff's Fourth Set of Requests for Admissions (162-203) filed Dec. 18, 2006; 27 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Defendant Camtek Ltd.'s Response and Objections to Plaintiff's Second Set of Request for Admissions (67-114) filed Dec. 18, 2006; 16 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Defendant Camtek Ltd.'s Response and Objections to Plaintiff's Third set of Requests for Admission (115-161) filed Dec. 18, 2006; 23 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Reply to Camtek's Second Amended Answer and Counterclaim filed Jan. 5, 2007; 4 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Subpoena in a Civil Case filed Jan. 5, 2007; 13 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Responses to Camtek Ltd.'s Second Set of Requests for Admission to Plaintiff's (Nos. 48-55) filed Jan. 19, 2007; 7 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Responses to Defendant's Third Request for the Production of Documents and Things (Nos. 94-103) filed Jan. 19, 2007; 8 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Response to Defendant's Interrogatory No. 18 filed Jan. 19, 2007; 3 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Memorandum of Law in Support of Plaintiff's Motion to Compel Production of Falcon Source Code Revision History filed May 25, 2007; 5 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek's Motion to Compel filed May 25, 2007 2 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Amended Responses to Camtek Ltd.'s Second Set of Requests for Admission to Plaintiffs (Nos. 48-55) filed Aug. 2, 2007; 8 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Declaration of Rachel Zimmerman in Support of Plaintiff's Opposition to Camtek's Motion to Compel filed Sep. 17, 2007; 3 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Order filed Oct. 3, 2007; 7 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Order filed Nov. 21, 2007; 2 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Memorandum Opinion and Order filed Jan. 3, 2008; 29 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek Ltd.'s Memorandum of Law in Support of its Motion for Summary Judgment of Invalidity of US Patent No. 6,826,298 filed Feb. 8, 2008; 12 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek's Motion for Summary Judgment of Invalidity of US Patent No. 6,826,298 filed Feb. 8, 2008; 2 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment filed Mar. 14, 2008; 13 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Transcript of Thomas Verburgt's Deposition dated Sep. 21, 2006; 46 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Transcript of Jeffrey O'Dell's Deposition dated Sep. 22, 2006; 80 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Transcript of Cory Watkins Deposition dated Sep. 28, 2006; 76 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Transcript of Mark Harless Deposition dated Sep. 29, 2006; 65 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Answers to Defendant's Interrogatory No. 11 and Referenced Documents dated Nov. 20, 2006; 9 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Transcript of John Vasuta Deposition dated Dec. 20, 2006; 74 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Transcript of Stan Piekos Deposition dated Dec. 21, 2006; 63 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Transcript of Steven Palm Deposition dated Jan. 5, 2007; 49 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Transcript of Thomas Verburgt Deposition dated Jan. 9, 2007; 20 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Transcript of Jeffrey O'Dell Deposition dated Janaury 24, 2007; 84 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Transcript of Mayson Brooks Deposition dated Feb. 5, 2007; 75 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Transcript of Jeffrey O'Dell Deposition dated Feb. 6, 2007; 105 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Expert Report of John Phillip Mellor, Ph.D dated Aug. 3, 2007; 180 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Rebuttal to Expert Report of John Hillip Mellor, Ph.d, dated Aug. 3, 2007; 16 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Transcript of Paul Kempf Deposition dated Dec. 6, 2007; 25 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Expert Report of David L. Adler, Ph.D dated Jun. 20, 2007; 554 pgs.

Camtek's Motion for Judgment as a Matter of Law (JMOL); dated Jun. 22, 2009; 35 pgs.

Plaintiffs Opposition to Motion for JMOL; dated Jul. 14, 2009; 26 pgs.

Camtek's Reply in Support of Motion for JMOL; dated Aug. 8, 2009; 15 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek'Memorandum in Opposition to Plaintiff's Motion for Entry of Judgement and to Dismiss Inequitable Conduct, Declaration of Autuoro with Exhibits 1, 3-24, and Declaration of Troxel with Exhibits A-C; dated Jun. 19, 2009; 402 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Trial Transcript dated Feb. 2, 2009; pp. 1-501.

*August Technology Corporation* v. *Camtek Ltd.*, Trial Transcript dated Feb. 2, 2009; pp. 502-1001.

*August Technology Corporation* v. *Camtek Ltd.*, Trial Transcript dated Feb. 2, 2009; pp. 1002-1498.

*August Technology Corporation* v. *Camtek Ltd.*, Trail Transcript dated Feb. 2, 2009; pp. 1499-1997.

*August Technology Corporation* v. *Camtek Ltd.*, Trail Transcript dated Feb. 2, 2009; pp. 1998-2448.

*August Technology Corporation* v. *Camtek Ltd.*, Trail Transcript dated Feb. 2, 2009; pp. 2449-2865.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek's Memo in Support of Motion for Summary Judgment and Declaration of Autuoro with Exhibits A-C dated Feb. 8, 2008; 34 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiffs Memo in Opposition to Defendant's Motion for Summary Judgment and Declaration of Lee with Exhibits A-N. dated Mar. 14, 2008; 76 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Memorandum Opinion and Order dated Jul. 14, 2008; 11 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiffs Proposed Findings of Fact and Conclusions of Law dated Oct. 8, 2008; 16 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Verdict from *August* v. *Camtek* Trial dated Mar. 5, 2009; 9 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Order dated Feb. 1, 2009; 2 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiffs Memorandum of Law in Support of Motion for Entry of Judgment, Permanent Injunctions, Prejudgment Interest, and Accounting for Supplemental Damages, Declaration of Hughey (with Exhibits 1, 6-18), Declaration of Brooks, and Declaration of McCloskey dated Mar. 27, 2009; 296 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek's Memorandum of Law in Support of Motion to Defer Briefing and Decision on Plaintiff's Motion with Declaration of Autuoro and Exhibits 1-4 dated April 14, 2009; 78 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Combined Memorandum in Opposition to Motion to Defer and Motion to Dismiss Defendant's Inequitable Conduct Defense and Counterclaim and Declaration of Lee with Exhibits 1-6 dated Apr. 17, 2009; 45 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff' Reply in Support of Motion for Entry of Judgement and to Dismiss Inequitable Conduct dated Jul. 10, 2009; 17 pgs.

**US 7,729,528 B2**

Page 5

*August Technology Corporation* v. *Camtek Ltd.*, Order on Plaintiff's Motion to Dismiss Inequitable Conduct Defense dated Aug. 25, 2009; 16 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Order on Final Judgement dated Aug. 28, 2009; 9 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Camtek's Proposed Findings of Fact and Conclusions of Law dated Oct. 8, 2008; 3 pgs.

*August Technology Corporation* v. *Camtek Ltd.*, Plaintiff's Second Motion in Limine re Inequitable Conduct with Declaration of Lee and Exhibits dated Oct. 8, 2008; 106 pgs.



## Fig. 1



Fig. 2



Fig. 3



## Fig. 4



**Fig. 5**



D

D1

LOAD DEFECT MAP

D2

SELECT A DEFECT

D3

STAGE POSITIONS DEFECT FOR REVIEW

D4

DEFECT TYPE IS ENTERED

D5

REPEAT D2-D4 UNTIL ALL DEFECTS
ARE CLASSIFIED BY TYPE

D6

SAVE DEFECT MAP TO FILE

**Fig. 6**

E

DEFECT DATA IS STORED IN DATABASE

IF DESIRED OR REQUIRED, DEFECT DATA IS
EXPORTED TO THE SPECIFIED FILE IN THE
SPECIFIED FORMAT

REPORTS CAN BE GENERATED FROM THE
DEFECT DATABASE IN VARIOUS FORMATS
INCLUDING SINGLE WAFER REPORTS, LOT
REPORTS, AND MULTI-LOT REPORTS

**Fig. 7**



Fig. 8



Fig. 9



## Fig. 10



**Fig. 11**

JA0037



**Fig. 12**



Fig. 13



Fig. 14



**Fig. 15**

JA0041



Fig. 16



Fig. 17



Fig. 18



**Fig. 19**



Fig. 20



Fig. 21

US 7,729,528 B2

1

# AUTOMATED WAFER DEFECT INSPECTION SYSTEM AND A PROCESS OF PERFORMING SUCH INSPECTION

## REFERENCE TO RELATED APPLICATION

This application is a continuation of U.S. patent application Ser. No. 09/562,273, filed Apr. 29, 2000, now U.S. Pat. No. 6,826,298 which claims the benefit of U.S. Provisional Application Nos. 60/092,923, filed Jul. 15, 1998, 60/092,701, filed Jul. 14, 1998, and U.S. patent application Ser. No. 09/352,564, filed Jul. 13, 1999, now U.S. Pat. No. 6,324,298, issued Nov. 27, 2001.

## BACKGROUND OF THE INVENTION

### 1. Technical Field

The present invention relates to defect inspection systems for the semiconductor industry. More particularly, the present invention relates to an automated defect inspection system for patterned wafers, whole wafers, sawn wafers such as on film frames, JEDEC trays, Auer boats, die in gel or waffle packs, multi-chip modules often referred to as MCMs, etc. that is specifically intended and designed for second optical wafer inspection for such defects as metalization defects (such as scratches, voids, corrosion, and bridging), diffusion defects, passivation layer defects, scribing defects, glassivation defects, chips and cracks from sawing, and bump or bond pad area defects such as gold or solder bump defects or similar interconnect defects. Specifically, the present invention is an automated defect inspection system for integrated circuits, LCD panels with photolithography circuitry embedded therein, etc. where the system is used as follows: the system is trained by viewing a plurality of known good die under an imaging head resulting in a good die model, an inspection recipe is inputted into the system to define inspection parameters, defect inspection occurs where die are loaded onto, aligned in and viewed by an imaging head for defects in comparison to the good die model, an optional review of the identified defects may occur, and the user may optionally receive or export a report thereon.

### 2. Background Information

Over the past several decades, the semiconductor has exponentially grown in use and popularity. The semiconductor has in effect revolutionized society by introducing computers, electronic advances, and generally revolutionizing many previously difficult, expensive and/or time consuming mechanical processes into simplistic and quick electronic processes. This boom in semiconductors has been fueled by an insatiable desire by business and individuals for computers and electronics, and more particularly, faster, more advanced computers and electronics whether it be on an assembly line, on test equipment in a lab, on the personal computer at one's desk, or in the home electronics and toys.

The manufacturers of semiconductors have made vast improvements in end product quality, speed and performance as well as in manufacturing process quality, speed and performance. However, there continues to be demand for faster, more reliable and higher performing semiconductors.

One process that has evolved over the past decade or so is the semiconductor inspection process. The merit in inspecting semiconductors throughout the manufacturing process is obvious in that bad wafers may be removed at the various steps rather than processed to completion only to find out a defect exists either by end inspection or by failure during use.

A typical example of the semiconductor manufacture process is summarized as follows. Bare whole wafers are manu-

2

factured. Thereafter, circuitry is created on the bare whole wafers. The whole wafer with circuitry is then sawn into smaller pieces known in the industry as die. Thereafter, the die are processed, as is well known in the art, typically as die in waffle and/or gel packs or on substrates.

Today, it is well known that various inspection processes occur during this semiconductor process. Bare wafer inspection may occur on bare whole wafers not long after initial creation from sand and/or after polishing of the wafer but always prior to the deposit of any layers that form the circuitry. Defects being inspected for during bare wafer inspection include surface particulates and surface imperfections or irregularities.

During the deposition of layers, that is the circuit building, on the whole wafer, one or more first optical inspections may occur. First (1st) optical inspection is "in process" inspection of wafers during circuitry creation. This 1st inspection may be after each layer is deposited, at certain less often intervals, or only once during or after all deposits. This 1st optical inspection is usually a sub-micron level inspection in the range of 0.1 micron to <1 micron. This process is used to check for mask alignment or defects such as extra metal, missing metal, contaminants, etc. This 1st inspection occurs during circuitry development on the wafer.

Once the whole wafers are at least fully deposited on, that is all of the circuitry is created thereon, a post 1st (or 1.5) inspection occurs on the fully processed whole wafers. Generally, this is prior to the deposit of a passivation layer although it need not be. In addition, this post 1st inspection is generally prior to electrical testing or probing of the whole wafers. This inspection is typically a 0.5 micron to 1 micron optical inspection.

After the whole wafers are fully processed, one or more 2nd optical inspections are performed. Front end 2nd optical inspections occur after the whole wafers are fully processed and, if probing is necessary, just before or right after this probing or electrical testing to determine the quality of the devices. Back end 2nd optical inspections occur at various stages such as during the applying of bumps to the die or wafer, during or after sawing of the wafers into sawn wafers, during or after dicing of the wafers, during or after picking up and placing of the die onto other packages such as trays or waffle or gel packs, during or after placing of the wafers onto a substrate, etc. This 2nd optical inspection is generally at a 1+ micron level and is generally looking for defects such as metalization defects (such as scratches, voids, corrosion, and bridging), diffusion defects, passivation layer defects, scribing defects, glassivation defects, chips and cracks from sawing, and probe or bond pad area defects.

After actual packaging, 3rd optical inspections occur. This packaging involves at least one of the following: placing the die on a substrate, wire bonding the die, connecting the leads, attaching the balls to a flip chip, etc. At this point, the inspection involves inspecting the ball grid array, lead straightness, wire bonding, ink marking, and for any package defects such as chips, cracks and voids. This 3rd level inspection is generally at a 5+ micron level.

The focus of the semiconductor inspection industry has been bare wafer and 1st optical inspection. Numerous market leaders have developed, patented, and are manufacturing and marketing 1st optical inspection systems to perform these inspections including ADE, KLA, Tencor, Inspex, Applied, Orbit and others.

Often this equipment is very expensive and large. At the 1st inspection stage, this expense and machine size issue is not as significant as at later inspection stages because only a relatively few parties manufacture the silicon wafers and thus

US 7,729,528 B2

3

need to inspect bare wafers in comparison to the vast number of companies that buy bare or sawn wafers and further process them into finished chips. These often expensive and large inspection devices are not cost justifiable for smaller shops and as such, inspection equipment is needed that satisfies this need at the 2nd and 3rd stages as well as is more economical for the vast many smaller companies that finish process wafers.

To a lesser extent, some resources have been spent on 3rd optical inspection and several companies including STI, View Engineering, RVSI, and ICOS have developed systems for this purpose and are marketing those systems.

However, none of these systems address the particular and unique constraints of 2nd optical and this area has been largely ignored. In actual application, 2nd optical inspection has been marginally performed by manual inspection using humans and microscopic equipment. This manual process is inaccurate due to various factors including stress, eye fatigue and boredom of the operator as well as different perceptions by different operators as to the significance of a finding. In addition, smaller circuit geometry and higher throughput requirements are increasing the demands on semiconductor inspection at this 2nd optical level, all of which further results in operator stress, eye fatigue, and sometimes lower quality.

In addition at the 2nd optical inspection stage to the need for inspecting for metalization defects (such as scratches, voids, corrosion, and bridging), diffusion defects, passivation layer defects, scribing defects, glassivation defects, chips and cracks from sawing, etc., bumps have taken on additional importance of recent. This is due to the recent surge in the use of bump interface connects, or flip chips, rather than leads which has magnified the importance of 2nd optical inspection and thus the need for equipment and systems over manual inspection.

OBJECTIVES AND SUMMARY OF THE INVENTION

It is an objective of the present invention to provide an automated inspection system that replaces the current manual inspection process.

It is a further objective of the present invention to provide a new, state of the art 2nd optical inspection system.

It is further an objective of the present invention to provide an automated defect inspection system of patterned wafers, whole wafers, sawn wafers, JEDEC trays, Auer boats, die in gel or waffle packs, MCMs, etc.

It is further an objective of the present invention to provide an automated defect inspection system that is specifically intended and designed for second optical wafer inspection although useful in other levels of optical inspection such as level 1.5.

It is further an objective of the present invention to provide an automated defect inspection system for inspecting for defects such as metalization defects (such as scratches, voids, corrosion, and bridging), diffusion defects, passivation layer defects, scribing defects, glassivation defects, chips and cracks from sawing, probe area defects, bump area defects and/or bond pad area defects.

It is further an objective of the present invention to provide an automated defect inspection system that eliminates or significantly reduces the need for manual microscopic inspecting of every die in every wafer.

It is further an objective of the present invention to provide an automated defect inspection system that views the ever-smaller circuit geometry in an accurate and rapid manner.

4

It is further an objective of the present invention to provide an automated defect inspection system that provides for higher throughput than manual inspections

It is further an objective of the present invention to provide an automated defect inspection system that provides for improved inspection quality and consistency.

It is further an objective of the present invention to provide an automated defect inspection system that provides for improved process control.

It is further an objective of the present invention to provide an automated defect inspection system that has inspection recipes therein and can create, copy and edit such recipes to customize the system to the user's inspection requirements.

It is further an objective of the present invention to provide an automated defect inspection system that uses digital image analysis to perform semiconductor wafer inspection.

It is further an objective of the present invention to provide an automated defect inspection system that is trained by inspecting good die so that once trained the system detects variations from what it has learned.

It is further an objective of the present invention to provide an automated defect inspection system that is trainable.

It is further an objectives of the present invention to provide an automated defect inspection system that develops a model of a good die and uses this model to inspect unknown quality die.

It is further an objective of the present invention to provide an automated defect inspection system that includes a "good die" training step and a defect inspection step using the good die model.

It is further an objective of the present invention to provide an automated defect inspection system that includes a "good die" training step, an inspection recipe creation step and a defect inspection step.

It is further an objective of the present invention to provide an automated defect inspection system that includes a "good die" training step, an inspection recipe creation step, a defect inspection step, a defect review step, and a report issuing or exporting step.

It is further an objective of the present invention to provide an automated defect inspection system that provides for multi-dimensional alignment of each wafer, substrate or other device having die thereon to be inspected such that every die is uniformly positioned.

It is further an objective of the present invention to provide an automated defect inspection system that provides for x, y and theta ($\theta$) alignment of each wafer, substrate or other device having die thereon to be inspected such that every die is uniformly positioned.

It is further an objective of the present invention to provide an automated defect inspection system that provides for course alignment, fine alignment, and/or focusing of each wafer.

It is further an objective of the present invention to provide an automated defect inspection system that provides "good die" modeling by viewing multiple good dies and developing a model therefrom.

It is further an objective of the present invention to provide an automated defect inspection system that provides for defect inspection using an imaging head or camera to view static and properly aligned die.

It is further an objective of the present invention to provide an automated defect inspection system that provides for defect inspection using an imaging head or camera to view dynamic or moving yet properly aligned die.

It is further an objective of the present invention to provide an automated defect inspection system that provides for

US 7,729,528 B2

5

defect inspection using an imaging head or camera to view dynamic or moving yet properly aligned die where a strobe illumination is used to capture still views of the dynamically moving die.

It is further an objective of the present invention to provide an automated defect inspection system that provides for review of the system detected defects whereby the user need not look at all die or all parts of die and instead only views the marked or noted defects.

It is further an objective of the present invention to provide an automated defect inspection system that provides means for accounting for drifting or non-regularity of die positioning or spacing.

It is further an objective of the present invention to provide an automated defect inspection system that provides means to inspect die on a stretched film frame where the dies are irregularly spaced, rotated, drifted, etc.

It is further an objective of the present invention to provide an automated defect inspection system that provides a method to measure the size, position, shape, geometry, and other characteristics of solder bumps, gold bumps, bond pads or the like.

It is further an objective of the present invention to provide an automated defect inspection system that provides a method to inspect the quality of gold bumps, solder bumps, interconnects or the like, or the probe marks on bond pads.

It is further an objective of the present invention to provide an automated defect inspection system that provides a method to detect defects on bond pads, bumps or interconnects.

Still other advantages and benefits of the invention will become apparent to those skilled in the art upon a reading and understanding of the following summary, and detailed description.

Accordingly, the present invention satisfies these and other objectives as it, relates to automated inspection equipment, systems and processes. Specifically, the present invention is an automated method of inspecting a semiconductor wafer in any form, size and shape including whole patterned wafers, sawn wafers, broken wafers, partial wafers, and wafers of any kind on film frames, dies, die in gel paks, die in waffle paks, multi-chip modules often called MCMs, JEDEC trays, Auer boats, and other wafer and die package configurations for defects, the method or apparatus comprising training a model as to parameters of a good wafer via optical viewing of multiple known good wafers, illuminating unknown quality wafers using at least one of a brightfield illuminator positioned approximately above, a darkfield illuminator positioned approximately above, and a darkfield laser positioned approximately above the periphery of a wafer test plate on which the wafer is inspected, all of which are for providing illumination to the unknown quality wafers during inspection and at least one of which strobes during inspection, and inspecting unknown quality wafers using the model.

BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiment of the invention, illustrative of the best mode in which applicant has contemplated applying the principles, are set forth in the following description and are shown in the drawings and are particularly and distinctly pointed out and set forth in the appended claims.

FIG. **1** is a perspective view of one embodiment of the system;

FIG. **2** is an overall flow chart of the process;

FIG. **3** is a more detailed flow chart of one step in the process as shown in FIG. **2**;

6

FIG. **4** is a more detailed flow chart of one step in the process as shown in FIG. **2**;

FIG. **5** is a more detailed flow chart of one step in the process as shown in FIG. **2**;

FIG. **6** is a more detailed flow chart of one step in the process as shown in FIG. **2**;

FIG. **7** is a more detailed flow chart of one step in the process as shown in FIG. **2**;

FIG. **8** is an overall perspective view of a similar system to that shown in FIG. **1** taken at a different angle;

FIG. **9** is a front view of the wafer top plate and optics;

FIG. **10** is a left front perspective view of a portion of the inspection station including the wafer top plate and optics;

FIG. **11** is a right front perspective view of the top portion of the inspection station;

FIG. **12** is a side perspective view of the top portion of the inspection station as shown in FIG. **11**;

FIG. **13** is an enlarged view of the optics and wafer top plate;

FIG. **14** is a side view of the wafer top plate and optics of FIG. **9**;

FIG. **15** is a left side perspective view of the top portion of the inspection station as shown in FIGS. **10**-**12**;

FIG. **16** is an enlarged view of one embodiment of the wafer top plate and the x, y and θ aligner;

FIG. **17** is a partial perspective view of the top portions of the inspection and wafer handling stations;

FIG. **18** is an enlarged view of the wafer handling and wafer top plate portions of the invention;

FIG. **19** is a side view of the wafer handling station;

FIG. **20** is a partial view of the darkfield option of the present invention; and

FIG. **21** is an enlarged view of the darkfield lasers of the darkfield option.

Similar numerals refer to similar parts throughout the drawings.

DESCRIPTION OF THE PREFERRED EMBODIMENT

The automated defect inspection system of the present invention is indicated generally at **10** as is best shown overall in FIGS. **1** and **8** (but in detailed portions in FIGS. **2**-**7** and **9**-**21**) and is used in one environment to find defects on die on patterned wafers W but is intended for this and other uses including for inspecting whole wafers, sawn wafers, broken wafers, wafers of any kind on film frames, die in gel paks, die in waffle paks, MCMs, JEDEC trays, Auer boats, and other wafer and die package configurations (although hereinafter all of these uses shall be referred to generally as inspection of wafers W). The system inspects for many types of defects including, but not limited to, the following: metalization defects (such as scratches, voids, corrosion, bridging, etc.), diffusion defects, passivation layer defects, scribing defects, glassivation defects, chips and cracks from sawing, probe or bond area defects (such as missing probe marks, discoloration, missing metal and probe bridging), diffusion faults, vapox, etc. The system may also be additionally or alternatively used to inspect interconnects or bumps, such as gold or solder bumps, for defects or other characteristics such as size and shape.

The system and process encompasses, in general, a multiple step process as shown in FIG. **2** of training (step A) the system, creating (step B) an inspection recipe, inspecting (step C) die or wafers based upon this training and recipe, defect review (step D) if desired, and defect reporting (step E) if desired. The system **10** for performing this process

US 7,729,528 B2

7                                                                    8

includes, in general, a wafer test plate **12**, means for providing a wafer to the test plate referred to as **14**, a wafer alignment device **16** (x-y-Θ or x-y-z-Θ aligner) for aligning each and every wafer at the same x, y, and Θ location or x, y, z, and Θ location, a focusing mechanism **18**, a camera **20** or other visual inspection device for visually inputting of good die during training and or visual inspection of other unknown quality die during inspection, a parameter input device **22** for inputting parameters and other constraints or information such as sensitivity parameters, geometries, die size, die shape, die pitch, number of rows, number of columns, etc., a display **24** for displaying the view being seen by the camera presently or at any previous saved period, a computer system **26** or other computer-like device having processing and memory capabilities for saving the inputted good die, developing a model therefrom, and comparing or analyzing other die in comparison to the model, a marking head, a frame **30**, a hood **32**, a control panel **34**, and a system parameters display **36**.

In more detail the system **10** and associated process are as follows. Training (step A) as initially displayed in FIG. **2** and shown in more detail in FIG. **3** involves (1) defining and/or training alignment features and parameters (and storing) in the computer system **26** for use during training where all of this is shown as step A**1**, (2) defining (and inputting into the computer system) the wafer and/or die geometries, the wafer and/or die sizes, the die pitch, the number of rows, the number of columns, etc. and storing all such information in the computer system **26** for use during training and/or inspecting where all of this is shown as step A**2**, (3) training the system as to what a "good die" comprises by aligning via device **16** and viewing via camera **20** a plurality of known good die and forming a model within computer system **26** to define what an ideal die should look like based upon the common characteristics viewed where all of this is shown as step A**3**, (4) setting inspection parameters which are values that indicate to the computer system **26** how close an unknown quality die must match the good die model to be considered a good die (that is, what differences from the exact model are tolerable to still be considered a good die) where all of this is shown as step A**4**, and (5) saving this training model and its features, parameters, etc. to the computer system **26** as shown by step A**5**.

Creating (step B) an inspection recipe involves creating a new recipe (if a previously defined recipe is to be used, then the creating step of B is skipped). Creating a new recipe involves (1) defining how wafers W are selected from cassettes or other storage receptacles where all of this is shown as step B**1**, (2) defining how the dies on each wafer W are to be selected for defect inspection where all of this is shown as step B**2** (often dies are merely inspected in sequential or similar order; however, any other order may be defined), (3) defining how defect inspection map files are imported and exported where this is shown as step B**3**, and (4) save this recipe where this is step B**4**.

Inspecting (step C), referred to as defect inspection, involves (1) inputting a wafer identification code, if desired, and is referred to as step C**1**, (2) selecting a recipe that was defined in step B where this selecting is step C**2**, (3) selecting and inputting a product setup which is step C**3**, (4) loading a wafer onto the wafer test plate **12** using the wafer providing means **14** where loading is step C**4**, (5) aligning the wafer on the wafer test plate **12** using the wafer alignment device **16** for aligning each and every wafer at the same x, y, and θ location or x, y, z, and θ location and using the defined and/or trained alignment features and parameters of step A**1**, all of which is shown as step C**5**, (6) focusing the camera **20** onto the wafer W if needed, all of which is shown as step C**6** (7) collecting an image of the wafer W using the camera **20** by moving the plate

**12** to align the camera with a first die or other portion thereof, viewing and recording that die or portion thereof by opening the shutter and allowing the camera to view and record the image, moving the plate **12** to align the camera with another die or portion thereof, viewing and recording this another die or portion thereof, and repeating these steps until all of the die or portions thereof on the wafer that are desired to be viewed have been viewed and recorded, all of which is shown as step C**7**, (8) simultaneously during step C**7**, determining where defects are located on the given die being viewed based upon the "good die" model of step A**3** and the tolerances of step A**4**, all of which is step C**8**, and (9) creating a defect map of the wafer W which is a collection of all of the images of all of the die including all of the defects found thereon, all of which is step C**9**.

Alternatively, step C**7** may be replaced by the step of collecting an image, of the wafer W using the camera **20** by continuously moving the plate **12** so as to scan over all of the die on the wafer whereby the wafer is illuminated by a strobe light at a sequence correlating to the speed of the moving plate so that each die is strobed at the precise time it is under the camera **20**. This allows for the continuous collecting of images without necessitating the stop and go procedure of aligning the camera with a first die, viewing and recording that die, moving the plate **12** to align the camera with another die, viewing and recording this another die, and repeating these steps until all of the die on the wafer have been viewed and recorded, etc.

Defect review D if and when it is desired (which is generally at the conclusion of defect inspection on a given wafer W since it is at this point that defect classification is often desired) involves (1) loading the defect map created in step C**9**, this reloading referred to as step D**1**, (2) selecting a defect to review (or alternatively reviewing all of the defects on the wafer in order) as step D**2**, (3) moving the plate **12** so as to position the wafer W such that the particular die with defect thereon is properly positioned under the camera **26**, all of which is step D**3**, (4) user viewing and classifying of the defect such that user of the system **10** views and classifies the viewed defect, all of which is referred to as step D**4**, (5) repeating of steps D**2**-D**4** until all of the defects that the user desires to review have been reviewed and classified as step D**5**, and (6) saving of classified defect map as step D**6** as well as alternatively or additionally saving the defect information in any of a number of other formats for database or other management and review.

Defect reporting E if and when it is desired involves exporting or printing out the data stored in database format in step D**6**. This data may then be analyzed or otherwise used to perform statistical or other analysis on the types of defects, frequency of defects, location of defects, etc. which is useful to the wafer W manufacturers so as to allow them to focus on defect laden areas.

The above described steps and substeps are a basic explanation of the system and process of the present invention. The following description is a more detailed explanation of various parts and systems, and details of the steps these perform.

The wafer test plate **12** is a rotary stage that is equipped with a universal interface platform with vacuum, all of which provides a flexible interface for wafer, and die package fixturing. It is defined such that it quickly mounts and inspects; whole wafers, sawn wafers on film frame, die in gel pak, die in waffle-pak, MCM, JEDEC trays, Auer boats, and other wafer and die package arrangements and configurations.

The means for providing a wafer to the test plate referred to as **14** may be either manual in that the user moves the wafer from a cassette or magazine to the test plate **12**, or automatic

9
10

as is shown in the embodiment of the Figures. In the automatic environment, the wafer providing means **14** includes a robotic arm that pivots from a first position where a wafer W is initially grasped from a magazine or cassette to a second position where the wafer W is positioned on the wafer test plate **12** for inspection. After inspection, the robotic arm pivots the wafer W from the second position at the test plate **12** back to the first position where the wafer W is placed back in or on the magazine or cassette.

The robotic arm in the embodiment shown is a two part arm which has two sections, the first of which pivots about a center support and the second of which pivots about the end of the first. Surrounding the robotic arm in one embodiment is at least one cassette receiver (two shown in FIG. **1**) which receives standard wafer transportation cassettes in which multiple wafers are stacked, an optional wafer pre-aligner which would provide a pre-alignment or rough alignment of the wafer, an OCR (optical character recognition) system, and the inspection station which includes the wafer top plate **12**, x-y-θ aligner **16**, cameras **20**, etc.

The wafer alignment device **16** for aligning each and every wafer at the same x, y, z, and θ location is a precision system of rotary motors, ball screws, direct or belt driven motors, worm or other gears, actuators, hydraulics, push rods, vacuums, or other mechanical or electrical equipment for moving the rotary stage either linearly or angularly to a precise desired location.

The same alignment mechanism and process is used during training as is used during inspection. Specifically in the embodiment shown, the wafer alignment device is a 2-D x, y and θ alignment process that is optionally coupled to a z height control. Specifically, it is in one example a 2-D x and y course alignment followed by a fine theta (θ) alignment process, all of which is coupled with and followed by a focus map process (using a previously generated height or focus map) for determining height or z and thus assuring the wafer is in focus. Basically, the course alignment uses a pattern located at the approximate wafer center which it has been trained to know and expect x and y location on thereby allowing it to find this pattern and x and y (2-D linear) orient the wafer as such to at least course align it This orientation is performed using the stage **12**. Thereafter, fine alignment is performed by using a pattern near the perimeter of the wafer which it has been trained to know to get the θ (rotational) alignment correct. This is also performed using the stage **12**. In both cases, the camera finds the pattern and the alignment mechanism moves the wafer until it is aligned.

The focus map or z orientation is performed by adjusting the camera and/or camera arm distance prior to focusing as is described below, and/or by changing objectives, and/or by focusing the camera. The adjustment that is performed is based upon a height map of the wafer from which focus is defined using pre-programmed points on the wafer.

The focusing mechanism **18** is an optical imaging mechanism with multiple optics therein for using different inspection resolutions. A motorized microscopic turret allows for selecting of the imaging optics from the multiple choices. For instance, a number of optics, such as three or five optics, may be supplied and typical choices include 1.25×, 2.5×, 5×, 10×, 20×, 50× and 100× objectives although any other objective is contemplated. The motorized microscopic turret and discrete objectives provide the means to select the optical magnification.

The camera system **20** or other visual inspection device is for visual inputting of good die during training and for visual inspection of other unknown quality die during inspection. The camera system may be any type of camera capable of high resolution inspection. An example of one part of such a camera system is a 3-CCD inspection camera used to capture die or other images during defect analysis.

One example of camera system **20** that is contemplated by the present invention is a two (2) camera system where one camera is an inspection camera and the other is a viewing camera. The inspection camera is a high resolution CCD camera that provides high resolution gray-scale images for inspection. The viewing camera is a high fidelity color image camera for visual review of found defects in, for example, 758×582 pixel resolution or alternatively 1008×1018 pixel resolution or other known pixel sizes. In addition, the viewing provides high quality color images for operator defect review.

Computer controlled optics are provided that use long working distance microscopic objectives so as to provide for low distortion images that are required for accurate defect detection. Multiple magnifications may be automatically selected based on the user defined inspection recipes as described below.

Computer controlled illumination is integrated into and with the inspection camera and optics to complete the wafer imaging process. Alternatively, the illumination system may be coupled to the camera and optics so long as the illumination system works in conjunction with the camera. In a strobing environment as described herein, the illumination flashes or strobes on and off while the camera is continuously open whereby the strobing of light creates a plurality of differing images as the continuously operating camera passes over the substrate. In a non-strobing environment, the illumination is typically continuous or as needed while the camera shutters, that is opens and closes its viewing aperture such as via in one. example a high speed electronic shuttering mechanism, as is needed to capture each desired image on the substrate.

Illumination may be by any known illumination means such as high intensity lights, lasers, fluorescent lights, arc discharge lamps, incandescent lamps, etc. The angle of the illumination may be of a brightfield only, darkfield only, or both brightfield and darkfield variety.

Brightfield illumination involves illuminating the substrates from above where the illumination system is typically adjacent to or part of the camera which is mounted directly above the substrate, that is at approximately a 90° or so orientation to the substrate as shown in FIG. **1**. In the embodiment shown, the brightfield illuminator is adjacent to the camera and functioning in unison therewith. This brightfield illumination is very effective in illuminating flat or relatively flat objects on a substrate as the light is reflected generally back to the camera. In contrast, 3-d objects on the substrate will angularly reflect the light causing the light to be angled away from the camera. As a result, flat objects appear bright to the camera while 3-d objects appear dark.

Darkfield illumination is often used in conjunction with the brightfield to "brighten" the 3-d objects, or in the alternative to only brightly see the 3-d objects. The darkfield light is provided at low angles to the wafer top plate **12**. The darkfield illumination works inverse of the brightfield in that it reflects light up to the camera at an angle, such as any angle between approximately 10° and 90°, to the substrate when the darkfield light is introduced to 3-d object on the substrate at an angle rather than from directly above as in brightfield illumination, while reflecting light at an angle along the periphery opposite the light introduction where the object is flat. Darkfield light thus brightly illuminates 3-d objects while not illuminating flat objects very well.

In one embodiment of the present invention, two darkfield options are available, namely a high angle darkfield illumi-

US 7,729,528 B2

11                                                                        12

nation and a low angle darkfield illumination. The high angle darkfield illumination is provided in one embodiment at an angle between approximate 10° to approximate 80° between the brightfield illumination provided from directly above the substrate (perpendicular to the substrate) to the low angle darkfield illumination provided at almost a parallel angle to the substrate. High angle darkfield illumination may be provided by any of a number of light sources including all of those listed above describing general illumination; however, in one embodiment the high angle darkfield illumination is either a ring light, or a fiber optic bundle providing light angled toward the substrate at approximately a 45° angle.

The system **10** with a low angle darkfield option as shown best in FIGS. **20-21** to include a plurality of illuminators spaced about the periphery. In one example four illuminators are used and each is equally spaced from the other at a 90° separation. In another example (FIGS. **20-21** where one pair are shown), eight illuminators are used at a 45° separation, and in an alternative associated therewith and shown in the drawings, the illuminators are teamed up in pairs at 90° separation to double the capacity of the illuminators at a given angle. In the embodiment shown, the low angle darkfield illuminators are lasers. In this embodiment, the lasers provide darkfield light at low angles to the wafer plate **12**. Specifically, the angle between the laser beam focused on a focal point of the substrate and the general planar nature of the substrate is low or minimal, such as less than 10°. As a result, the darkfield illumination emitted from the laser reflects off of the substrate and up to the camera at an approximate 80° to approximate 90° angle to the substrate, and preferably approaching approximately 90°, when the darkfield light is introduced to the 3-d object, such as a bump, on the substrate.

The user, where the system is equipped with both brightfield and darkfield illumination, has the option of using one or the other or both. This provides significant options. For instance, if the inspection is being performed on die that tend to only have flat objects thereon, brightfield illuminates these objects well and is more than sufficient for this type of inspection. Alternatively, if the inspection is being performed on die that tend to have 3-d objects, then darkfield may be sufficient. However, as in many cases, such as with gold bumps which are generally very flat but very rough and tend to include 3-d nodules protruding therefrom, a combination of the two is often beneficial. In this example, the brightfield illumination indicates the presence of any defects such as scratches, etc. and the presence of the bump while the darkfield illumination shows the nodules and rough surface on the bump. Without the darkfield, the bump shows up as a dark image. Once darkfield is introduced, the nodules are located as white spots on the bump.

Darkfield also assists in defect classification because brightfield light does not differentiate between a particle or defect that extends from the surface versus one that is embedded or scratched into the surface. Darkfield illumination does differentiate these extending versus embedded defects.

In one embodiment, the system **10** includes a brightfield illumination system that is physically located adjacent to or incorporated physically into the camera so as to provide brightfield illumination from above the objects illuminated. In another embodiment, the system **10** includes a darkfield illumination system that is located peripherally around the wafer top plate **12** at low angles of difference from the top plate, angles such as 1° to 10°. In an even further embodiment, both brightfield illumination from above the object and darkfield illumination from around the periphery of the object are provided. As indicated above, the illumination as provided by the brightfield and darkfield illumination systems may be provided by any known illumination source such as a white light source such as incandescent, fluorescent, or other similar gas envelope or similar electrical lights, or by lasers or similar devices.

The parameter input device **22** is for inputting parameters and other constraints or information. These parameters, constraints and information include sensitivity parameters, geometry, die size, die shape, die pitch, number of rows, number of columns, etc. It is contemplated that any form of input device will suffice including a keyboard, mouse, scanner, infared or radio frequency transmitter and receiver, etc.

The display **24** is for displaying the view being seen by the camera presently or at any previous saved period. The display is preferably a color monitor or other device for displaying a color display format of the image being viewed by the camera **20** for the user's viewing, or alternatively viewing an image saved in memory. This monitor, or another adjacent or other monitor may be used to view the gray-scale inspection image of the camera **20** that iis being used by the system **10**. This display **24** is used during inspection to show the image being viewed by the camera **20**. In addition, the system parameters display **36** is also available for displaying other information as desired by the user such as system parameters.

The computer system **26** or other computer having processing and memory capabilities is for saving the inputted good die, developing a model therefrom, and comparing or analyzing other die in comparison to the model based upon defect filtering and sensitivity parameters to determine if defects exist. The computer system **26** is also used to perform all other mathematical and statistical functions as well as all operations. In one embodiment, the computer system **26** is of a parallel processing DSP environment.

The marking head is provided for marking a particular die such as a defective one. In one embodiment, the marking head is a die inking mechanism. It is used whereby each die may be inked after inspection, or all defective die may be inked, or all defective die may be inked after review and/or classification, etc. Inking may also be used in a "forced inking" manner whereby pre-specified die are inked regardless of electrical or visual inspection such as all die at the edge of the wafer.

An air knife is optionally provided for cleaning the wafers prior to inspection. The air knife is basically a conduit of some design through which air may be injected where the conduit includes one or more orifices or outlets. The air is projected out of the orifices which are selectively positioned on the conduit and in relation to the wafer so as to blow dust and other particles off of the wafer prior to review. This helps to eliminate false defect determinations.

These systems and parts are part of system **10** and are used to perform the defect inspection. This defect inspection is briefly described above, and is now described below in detail.

The overall training step A is described below in more detail.

The step A1 is defining and/or training alignment features and parameters (and storing) in the computer system **26** for use during training. This alignment technique, when performed in step A3 and C5 as described below to define a good die and to inspect, is a two function process, namely a physical alignment and an image alignment. At this point we define what parameters are to be used during the physical and image alignment These parameters include defining markers as are needed during physical alignment, and distinct elements and buffers as are needed during image alignment. The actual physical and image alignment steps occur during step A3 and C5 as described below.

The step A2 is defining (and inputting into the computer system) the wafer and/or die geometry, the wafer and/or die

US 7,729,528 B2

13                                                                                    14

sizes, the die pitch, the number of rows, the number of columns, etc. and storing all such information in the computer system 26 for use during training and/or inspecting.

The step A3 is training the system as to what a "good die" comprises by aligning via device 16 and viewing via camera 20 a plurality of known good die and forming a model within computer system 26 to define what an ideal die should look like based upon the common characteristics, elements, ranges, etc. viewed. A good die is defined as a die that does not have defects but may very well and is actually likely to have process variations in it; however all of these process variations have been deemed not to be defects and rather to be acceptable variations. Preferably, the entire or full spectrum of acceptable random deviations is supplied by this training set of typically twenty, thirty or up to one hundred good die that are shown to are required to meet the definitional requirements of a mean and standard deviation) the system during training, although no minimum (however, definitionally at least two or maximum is required. However, the larger the pool the more accurate the results because a better, more diverse model is created. Thus color drifts and contrast shifts as well as many other deviations would be part of the training set. Basically, the system 10 performs die inspection by studying a user-provided set of known good die.

The alignment may involve either physical alignment or image alignment, or both. Physical alignment basically involves inputting specific location markers on or around each wafer, die or sub-section of die which are used as location points from which the wafer and die are located and aligned. At step A1, these markers were defined.

Physical alignment involves the wafer test plate 12 via the wafer alignment device 16 aligning each and every wafer, die, etc. in the same x, y, and θ location by looking for and aligning with these location markers. In use, the system takes an overall picture or image of the wafer, die or sub-section thereof and looks for the specific location markers. The system uses a hunting method to find the markers. Once one or more specific location markers are identified, and it is found that the markers are in some other location or orientation than expected, then the wafer test plate 12 spins, turns, adjusts or otherwise moves in a translational or rotational manner in the x, y, and θ directions the wafer, die or sub-section.

The system also may perform image alignment. During step A1, distinct elements and buffers, as are needed in image alignment, were defined.

This image alignment may also be referred to as software alignment as the software actually performs the alignment by aligning the image that is taken rather than physically moving the wafer or die. This image alignment is performed on each section of the wafer, such as each die, during one or both the good die modeling and the unknown quality die inspecting. It is often necessary because each image taken may be off slightly in comparison to adjacent images or to a common location on another wafer. The actual process of image alignment basically assures that all images taken of a particular location will align, that is when overlapped the features of the images will align, rather than have an offset or twist, so that only defects stick out.

Image alignment, when performed as needed in steps A3 and/or C5, involves the camera looking for a distinct element on the die from which to turn or move the image to "square" it up. The distinct element is generally an element large enough that defects therein will not be an issue. The element also must be of a distinct shape. If the distinct element is where we expect it to be then the image lines up and no image alignment is necessary; however, it is not, then the distinct element must be found and the image adjusted.

The hunting for the distinct element in image alignment may be performed on the entire die. However, this is expensive and time consuming. As a result, smart alignment may alternatively be performed.

With smart alignment, a buffer is defined into the image. This buffer allows for "wiggle", that is movement or twisting in the image. This buffer is typically an x amount and a y amount of movement that is expected. This buffer is then used to define the area around the expected location of the distinct element to be searched for the distinct element. Once the distinct element is found, then the x and y distance that the distinct element is off from the expected distinct element location is the distance the entire image is moved in the x and y direction to align the image.

The viewing encompasses collecting an image of the wafer W, a known good wafer, using the camera 20 by moving the plate 12 to align the camera with a first image which may be the whole wafer, a part of the wafer, a die, or a part of a die and then viewing and recording that image. Thereafter moving the plate 12 to align the camera with another image, viewing and recording this another image, and repeating these steps until all of the images on the wafer have been viewed and recorded. An alternative step C8 involves continuous motion and strobe illumination as is described below. In either case, this is then repeated for a plurality of known good die or wafers as viewing of a pool of wafers is necessary to form a model of a good die.

The actual defect inspection algorithm is calculated from the collection of images of the set of "good die". An image or images are taken of each good die in a set of good die. Each image is composed of pixels such as for example an approximately one thousand by one thousand (1000×1000) array or grid of pixels, although any number may be used. For each same pixel on all of the good die images, that is for each common x,y coordinate, which is a pixel, a mean and standard deviation is calculated of the pixel value, that is the gray-scale value of that given pixel. So in a grouping of 30 good die, as used as an example above, where each die is an array of 1000×1000 spots (1 million total spots) each referred to as a pixel, a mean and a standard deviation of the gray-scale number for each pixel at x,y coordinate 1×1, 1×2, 1×3 and so on all the way to 1000×1000 is calculated; that is a mean and standard deviation is calculated for pixel 1×1 using the gray scale measurement for pixel 1×1 on all 30 die, and so on for each of the 1 million die.

In one embodiment, the gray scale numbers for each pixel, are used to calculate the mean and standard deviation, and these are in a range. One example is a 256 scale scheme, where one end, such as 0 in the 256 scale scheme, represents a dark or black colored or shaded image and the other end, such as 255 in the same 256 scale scheme, represents a white colored or shaded image.

The collection of all of the means, that is for all of the pixels, for a type of die is in effect the perfect die of that type and in essence defines the good die model. The collection of all of the standard deviations, as adjusted as described below for sensitivity and filtering, for a type of die is in effect the allowable range inside of which the die is deemed good, and outside of which the die is questioned as to defects.

The step A4 is setting inspection parameters which are values that indicate to the computer system 26 how close an unknown quality die must match the good die model to be considered a good die (that is, what differences from the exact model are tolerable to still be considered a good die). Several such inspection parameters are defect sensitivity, minimum defect contrast and defect filtering.

US 7,729,528 B2

15                                                                16

In the embodiment shown defect resolution is dependent upon the optical magnification. Selecting a higher magnification results in a smaller field of view of the image. The magnification selected may result that multiple images are required to inspect a single die or that many can fit in a single image. The die size and optical magnification are inputted in step A2. It is however noted that smaller defect resolution results in more imaging per die and thus additional time to defect inspect the same quantity of die. Alternatively, a camera with adjustable resolution may be implemented whereby this adjustment feature would control sensitivity rather than image size.

Defect sensitivity involves user defined multiplication factors of the mean and standard deviations calculated to define the known good die model as described above. Defect sensitivity is described below in more detail in step C7.

Minimum defect contrasting involves user defined absolute limits on the upper and lower limits defined from the mean and standard deviation. Minimum defect sensitivity is also described below in more detail in step C7.

Defect filtering involves statistical or data filtering including area, size, region of interest and/or clustering filtering, as well as connection and/or reduction factor filtering. This filtering allows the user to filter out items that appear as defects but are not in critical areas, of sufficient size or shape or are otherwise acceptable and thus desirable to not be labeled as defects. In the embodiment shown, defect filtering is provided for each inspection recipe or round. This allows the system performance to be optimized for the user's application. The defect filtering feature uses defect position and geometry information such as shape, size, x-y coordinates, etc. to automatically determine if the defect requires further review and classification by the operator. An example is as follows, any defects above a certain size may be determined to be positively defects not subject to further review. In addition or as an alternative, any defects below a certain size are filtered out as not being a defect although being outside of the "good die" model. There may also be an area in between that requires operator review at the review steps of step D4. Similarly, shapes, positions, configurations, arrangements, etc. of anomalies from the "good die" model may be filtered. Defect filtering is further defined below.

The step A5 is saving this training model and its features, parameters, etc. to the computer system 26.

The overall inspection recipe creating step B involves creating and storing an inspection recipe for each type of item, that is wafer, die, etc. to be inspected. An unlimited number of inspection recipes can be created, copied and edited so as to allow the user to customize the inspection process.

The step B1 is defining how wafers W are selected from cassettes or other storage receptacles. The step B2 is defining how the dies on each wafer W are to be selected for defect inspection. The step B3 is defining how defect inspection map files are imported and exported. The step B4 is saving this recipe.

The overall inspecting step C, referred to as defect inspection, is an advanced proprietary digital image analysis technique for semiconductor wafer inspection. The system performs wafer inspection after first studying a user provided set of known good die as described above in step A3. This method of learning and inspecting is more powerful than traditional template or model matching inspection. It is noteworthy that even random variations in a known good die may be determined to be acceptable which is not the case with traditional template or model matching. In effect, this robust approach to wafer inspection functions similar to a human operator without the fatigue and other problems.

The step C1 is inputting a wafer identification code if desired. This is required where wafer mapping is to occur because this provides a way to identify each wafer for later review of defects, etc. The wafer identification code may be of any known identification system such as alphanumeric characters, bar codes, 2-D matrix codes, etc.

The step C2 is selecting a recipe that was defined in step B. The step C3 is selecting a product setup if one is desired.

The step C4 is loading a wafer onto the wafer test plate 12 using the wafer providing means 14. Loading onto the wafer test plate may be either by manual loading or using an automatic system where wafer with die thereon are automatically transferred from a cassette or magazine into the inspection area. The automatic system allows for elimination of all manual handling.

The step C5 is aligning the wafer on the wafer test plate 12 using the wafer alignment device 16 for aligning each and every wafer at the same x, y, z, and θ location and using the defined and/or trained alignment features and parameters of step A1. This has been described above in detail as the same process of physical alignment and image alignment is used here as was used to align the known good wafers to form the good die model.

It is often also necessary to focus the camera 20 onto the wafer W if it is not already focused. This occurs, if needed, during or after step C5 and is the z orienting of the wafer which is defined by a height map.

The step C6 is collecting an image of the wafer W using the camera 20 by moving the plate 12 to align the camera with a first image which may be the whole wafer, a part of the wafer, a die, or a part of a die and then viewing and recording that image, and thereafter moving the plate 12 to align the camera with another image, viewing and recording this another image, and repeating these steps until all of the images on the wafer have been viewed and recorded. An alternative step C6 involves continuous motion and strobe illumination as is described below.

The step C7 is simultaneous with step C6 and involves determining, where defects are located on the given die being viewed based upon the "good die" model of step A3 and the tolerances or parameters of step A4. Basically, each pixel on the unknown quality wafer is viewed whereby defect sensitivity and filtering are used in conjunction with the "good die" model to determine if the pixel and/or any group of pixels are deemed "good" or questionable.

Initially anomalies or differences between the "good die" model and the image are spotted and then sensitized and filtered. To simplify the determination, an upper level and lower level value is determined for each pixel on each die, based upon the mean and standard deviation calculations as well as the user defined sensitivity and absolute limits. The viewed image is then filtered using one or more of a variety of filter techniques including connection factoring, reduction or noise reducing factoring, and statistical or data filtering on, blob identification such as area, size, region of interest, and/or interactive filtering. After filtering, the questionable defect areas are identified. Basically, defect sensitivity and minimum defect contrast are used to define the upper and lower level values which are in effect the adjusted standard deviations on either side of the mean once the sensitivity is factored in. Thereafter, filtering is often used to better identify true defects.

In one embodiment, defect sensitivity is basically a user defined multiple of the standard deviation. Through actual analysis of good and bad die, the user defines a multiple of the standard deviation that most accurately defines all of the defects yet does not wrongly define good die as defects. An

US 7,729,528 B2

17                                      18

example is as follows. Assume three known good die with gray scale values of 98, 100 and 102. The mean is 100 and the standard deviation is ±2. The user through inspection knowledge defines the defect sensitivity at 5. The upper and lower limits are then 110 and 90 respectively.

In one embodiment, the minimum defect contrast is similarly a user defined absolute limit. In the above example, the user through knowledge is aware that gray scale measurements with a minimum contrast of 15 are not defective. The minimum defect contrast is thus set at 15 and as a result the upper and lower limit must be 115 and 85 instead.

In the preferred embodiment, a test image is created using simple image subtraction after each pixel of an unknown quality wafer or die is viewed. A test image is created by basically subtracting the gray scale measurement of the test pixel, for example 98, from the good die upper limit, for example 110, for that pixel, or subtracting the good die lower limit, for example 90, from the gray scale measurement of the test pixel, again 98, to get a binary good or bad indication. The upper and lower limits have preferably been sensitized. If the number is positive then it is colored black as being inside the range (or alternatively white), and if the number is negative then it is colored white as being outside of the range (or alternatively black). A binary black and white image results. This image allows for filtering at a much more rapid speed due to its simplicity in comparison to saving an actual 256 color image. Alternatively, a full color, such as 256 color, image may be used if sufficient memory is available and optimal speed is not vital.

In one embodiment, one or more of the following filters are used on the binary black and white image. Image processing functions such as connection factoring and reduction factoring may then individually or all together be used. Statistical or data filtering on blob identification may also be performed individually or all together.

Connection factoring involves a "close" operation. The identified pixels, in the above example the white one, are dilated and then eroded, or double dilated and then eroded, or any other known combination. This connects or fills in the defects so as to filter out small defects or acceptable irregularities.

Reduction factoring involves an "open" operation. The identified pixels are eroded and then dilated, or double eroded and then double dilated, or any other known combination. This reduces noise.

Blob analysis involves identifying blobs on the binary black and white image. Once identified, various parameters of each are identified including, for example, size such as x size and y size, location, area, etc. Statistical or data filtering is then performed on the parameters of the blobs.

Such statistical or data filtering includes area filtering, size filtering, region of interest filtering, and interactive defect classification filtering. Area filtering discards blobs of a preset area or smaller. Size filtering discards blobs of a pre-set x or y size or smaller. Region of interest filtering allows the user to define locations on the die that are not of as much or any importance and as such any defects thereon would be irrelevant. Finally, interactive defect classification involves clustering of close but not touching identified pixels where the distance defining close is user defined.

Basically, the unknown quality die are inspected by viewing the image and comparing each pixel with its mean and standard deviation via the upper and lower limit values. Sensitivity and filtering also allows for compensation for factors that are deemed by the user to be more or less critical. In sum, if any one of the given viewed pixels in the unknown quality die is outside of the upper and lower limit values as sensitized

and filtered, then the die is defective and as described below, that defective spot is inked or otherwise noted.

The step C**8** is creating a defect map of the wafer W which is a collection of all of the defect data of all of the die and is stored in a data file. In the preferred embodiment, it is a binary black and white image.

As an alternative to the above described inspection steps, the alternative step C**6** which is the step of collecting an image of the wafer W using the camera **20** by continuously moving the plate **12** so as to scan over all of the die on the wafer whereby the wafer is illuminated by a strobe light at a sequence correlating to the speed of the moving plate so that each die is strobed at the precise time it is under the camera **20**. Basically a short illumination pulse of light on the moving plate effectively "freezes" the image. This allows for the continuous collecting of images without necessitating the stop and go procedure of aligning the camera with a first die, viewing and recording that die, moving the plate **12** to align the camera with another die, viewing and recording this another die, and repeating these steps until all of the die on the wafer have been viewed and recorded, etc.

The overall defect review step D is generally at the conclusion of defect inspection on a given wafer W since it is at this point that defect classification is often desired. The defect inspection or detection process of steps C is all automatic and rapid whereby once complete the user may manually inspect only the defects found based upon the parameters, filters, sensitivities, etc. rather than all of the die or wafer for defects. Significant time is saved.

The step D**1** is loading the defect map created in step C**9**. The step D**2** is selecting a defect to review (or alternatively reviewing all of the defects on the wafer in order). The step D**3** is moving the plate **12** so as to position the wafer W such that the particular defect is properly positioned under the camera **26**. The step D**4** is user viewing and classifying of the defect such that user of the system **10** views and classifies the viewed defect. Any number of classifications are available and the classifications are user defined. The step D**5** is repeating of steps D2-D4 until all of the defects have been reviewed and classified. The step D**6** is saving of classified defect map as well as alternatively or additionally saving the defect information in any of a number of other formats for database or other management and review.

The overall defect reporting step E is exporting or printing out the data stored in database format. This data may then be analyzed or otherwise used to perform statistical or other analysis on the types of defects, frequency of defects, location of defects, etc. which is useful to the wafer W manufacturers so as to allow them to focus on defect laden areas. This step E provides for complete and effective data analysis as it reports data in multiple formats including graphical, tabular, and actual image displays. The data that is placed in tabular format allows numerical values to be readily correlated with other values such as electrical results. The graphical data representation quickly shows trends that would otherwise be difficult to see.

The system **10** is based upon standard computer technology such as Pentium® Pro or similar computer platforms which allow for many different communication options of for example both a serial and network format. For instance, the system includes TCP/IP configuration and may alternatively include SEC-II/GEM or other computer industry standard protocols.

The system **10** may also be used to perform an inspection using a drift map. This is useful where the individual die of the wafer W are cut up on a film and stretched as needed for picking up and removal therefrom as is well known in the art.

19                                                                                  20

The problem here is that during stretching, the orthogonality may be lost and the die move in different directions and ways as the film material unevenly stretches. The approximately square or rectangular cut dies are now oriented in all different directions and as such a row of die is no longer straight but rather wavy or otherwise disoriented. When this drastic stretching and loss of orthogonality occurs, a drift map and drift step is added to account for this. This step is typically inserted prior to scanning.

In one embodiment, a frame grid is created for the purpose of defining the expected location of each die. It is known to stretch the film sawn wafers are transported on so as to allow easier picking up of each die without damaging neighbor die. This stretching however is typically not uniform resulting in disoriented die. The drift map predicts the stretched location of each die using the starting point of the die which was known due to the rigidity before sawing, and the pitch.

To create a drift map, a mark or dummy die is placed on the wafer at every nth location, such as every 10th. Using machine vision, the system 10 looks for the mark at its expected location and then looks thereabout if not found. Once the actual location is found, the machine vision proceeds to the expected location of the next mark and reiterates through the process. Once all of the marks have been found, a pitch is calculated assuming consistent behavior in between marks. Using this pitch and knowing the original location of each die prior to sawing, a drift map is created which accurately predicts the location of the die.

The system 10 may also incorporate use of an autofocus feature. Such a feature is based upon a sharpness calculation where a sweep of the image is taken at each of a predefined picture point. Thereafter, a sharpness calculation is used to find the correct focus point. To save time, this may be performed on only every nth image.

In sum, the basic sequence of operation is as follows, with the automated wafer transfer and wafer mapping options removed. The operator or user must first train the system as to what a "good die" is, that is create a good die model, or choose an existing good die model. As indicated above, this involves inputting and using location markers to properly align a plurality of known good die such that each die is imaged from the exact same x, y, z and θ location. In addition, wafer and/or die geometry, sizes, pitch, number of rows, number of columns, etc. must be inputted prior to imaging of good die. The plurality of good die are then each aligned and viewed by the CCD camera such that the computer system then forms a "good die" model by grouping all of the common characteristics, noting the ranges of pitches, colors, angles, locations, etc. Basically, the system 10 performs wafer inspection by studying a user provided set of known good die. It is generally preferred that at least twenty or thirty die are provided, although no minimum or maximum is required. Inspection parameters are also set to indicate how close an unknown quality die must match specific characteristics of the "good die" model to be considered a good die. These include sensitivity parameters and defect filters.

The user must also create or select a previously stored inspection recipe. This includes information as to how wafers W are selected from cassettes or other storage receptacles, how the dies on each wafer W are to be selected for defect inspection, how defect inspection map files are imported and exported, etc.

The system 10 is now ready to inspect unknown quality die. If identification codes are being used as are necessary where wafer mapping is active, one must be inputted at this point. Thereafter, a wafer W (or sawn wafer, or die in gel-pak, or die in waffle pak, etc.) is loaded onto the inspection area and

specifically the wafer test plate 12 (which is under the inspection camera). This is accomplished using the wafer providing means 14. Thereafter, the wafer alignment device 16 aligns the wafer at the same x, y, z, and θ location as the "good die" were loaded by using the defined and/or trained alignment features and parameters of step A1. The magnification desired is then selected and thereafter the camera 20 is focused.

The system is now ready to collect an image of the selected area (the first die position) of the wafer W using the camera 20 by moving the plate 12 to align the camera with the selected area, such as a first die position, so as to take a first image thereof which may be the whole wafer, a part of the wafer, a die, or a part of a die and then viewing and recording that image. Automatic defect inspection and bond pad analysis are performed on the die's digital image. If the die is inked, it is automatically identified (mapped) as an "inked die", and typically not inspected. If the die is not inked, and a defect was found, then the system will collect and store detailed information about each defect such as defect location on the die, size, shape, etc.

The plate 12 is then moved to align the camera with another selected area, which may be the next adjacent area or not, to take an image hereof (the second die position) on the wafer adjacent to the first image. Basically, the plate is indexed under the inspection camera to the next die position. This second die position is then viewed and recorded. These steps are repeated until all of the images on the wafer have been viewed and recorded. Simultaneous with these image viewing steps, defect sensitivity and filtering are used in conjunction with the "good die" model viewing to determine if initial anomalies or differences between the "good die" model and the image are actual defects or if they should be filtered out. A defect map of the wafer W is then created in the computer system from the collection of all of the defect of all of the die including all of the defects found thereon.

In another embodiment, rather than move the plate in incremental steps, the plate is continuously moved during strobe illumination thereof. The sections of the wafer are then scanned by synchronizing the camera with a strobe illumination so that when the camera is properly positioned over each section of the moving substrate, the strobe illumination occurs simultaneous with the image collection via the camera.

At the conclusion of defect inspection on a given wafer W, defect classification is often desired. Each archived defect is manually reviewed by the user where the plate 12 is moved to the position on the wafer W that the particular defect is positioned at so that the user may view and classify the defect. This is then repeated for all defects. The classified defects are then saved as a classified defect map.

That wafer is then removed and another wafer is loaded for inspection. This removal and loading of a new is either manually performed or may be automatically performed.

Accordingly, the invention as described above and understood by one of skill in the art is simplified, provides an effective, safe, inexpensive, and efficient device, system and process which achieves all the enumerated objectives, provides for eliminating difficulties encountered with prior devices, systems and processes, and solves problems and obtains new results in the art.

In the foregoing description, certain terms have been used for brevity, clearness and understanding; but no unnecessary limitations are to be implied therefrom beyond the requirement of the prior art, because such terms are used for descriptive purposes and are intended to be broadly construed.

US 7,729,528 B2

**21**

Moreover, the invention's description and illustration is by way of example, and the invention's scope is not limited to the exact details shown or described.

Having now described the features, discoveries and principles of the invention, the manner in which it is constructed and used, the characteristics of the construction, and the advantageous, new and useful results obtained; the new and useful structures, devices, elements, arrangements, parts and combinations, are set forth in the appended claims.

We claim:

1. An automated system for inspecting a substrate, the system comprising:

a wafer test plate;

a substrate provider for providing a substrate to the test plate, wherein the substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, at least one portion of a patterned wafer, an individual die, at least one portion of an individual die, a plurality of individual die, at least one portion of a plurality of individual die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC tray, and an Auer boat;

a visual inspection device for visual inputting of a plurality of known good quality substrates having a user defined level of quality during training and for visual inspection of other unknown quality substrates during inspection;

an illuminator for providing short pulses of light to each of the unknown quality substrates during movement between the substrate and the visual inspection device; and

a microprocessor having processing and memory capabilities for developing a model of good quality substrate and comparing unknown quality substrates to the model.

2. The automated system of claim 1, wherein the visual inspection device is configured to capture still images of each of the unknown quality substrates during continuous movement between the substrate and the visual inspection device.

3. The automated system of claim 2, wherein the short pulses of light are synchronized with the capturing of the still images.

4. The automated system of claim 1, wherein the illuminator is configured to provide the short pulses of light based on a velocity of the movement.

5. The automated system of claim 1, wherein the illuminator is configured to provide the short pulses of light at a sequence correlating to a velocity of the movement.

6. The automated system of claim 1, wherein the illuminator comprises a brightfield illuminator positioned approximately above the wafer test plate.

7. The automated system of claim 1, wherein the illuminator comprises a darkfield illuminator positioned approximately above the wafer test plate.

8. The automated system of claim 1, wherein the illuminator comprises at least one darkfield laser positioned approximately about a periphery of the wafer test plate for providing darkfield illumination at an angle of less than about six degrees to the wafer test plate.

9. An automated method of inspecting a semiconductor substrate, the method comprising:

training a model as to parameters of a good substrate via optical viewing of multiple known good substrates;

illuminating unknown quality substrates with an illuminator, the illuminator configured to provide flashes of light to each of the unknown quality substrates during movement of the substrate, wherein the substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, at least

**22**

one portion of a patterned wafer, an individual die, at least one portion of an individual die, a plurality of individual die, at least one portion of a plurality of individual die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC tray, and an Auer boat;

inspecting the unknown quality substrates using the model, thereby identifying acceptable quality substrates; and

performing at least one processing step on the acceptable quality substrates, thereby transforming the acceptable quality substrates into further processed substrates.

10. The automated method of claim 9, wherein the inspecting step comprises capturing still views of each of the unknown quality substrates during continuous movement of the substrate.

11. The automated method of claim 10, wherein the flashes of light are synchronized with the capturing of the still views.

12. The automated method of claim 9, wherein the illuminator is configured to provide the flashes of light based on a velocity of the movement.

13. The automated method of claim 9, wherein the illuminator is configured to provide the flashes of light at a sequence correlating to a velocity of the movement.

14. An automated system for inspecting a substrate, the system comprising:

a wafer test plate;

a substrate provider for providing a substrate to the test plate, wherein the substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, at least one portion of a patterned wafer, an individual die, at least one portion of an individual die, plurality of individual die, at least one portion of a plurality of individual die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC tray, and an Auer boat;

a camera for capturing still images of a moving substrate;

an illuminator for providing strobe illumination to the moving substrate; and

a controller for comparing pixel data for unknown quality substrates to a model of a good quality substrate.

15. The automated system of claim 14, wherein the illuminator is configured to provide the strobe illumination based on a velocity of the moving substrate.

16. The automated system of claim 14, wherein the strobe illumination comprises short pulses of light at a sequence correlating to a velocity of the moving substrate.

17. The automated system of claim 14, wherein the strobe illumination is synchronized with the capturing of the still images.

18. The automated system of claim 14, wherein the illuminator comprises a brightfield illuminator positioned approximately above the wafer test plate.

19. The automated system of claim 14, wherein the illuminator comprises a darkfield illuminator positioned approximately above the wafer test plate.

20. The automated system of claim 14, wherein the illuminator comprises a set of low angle darkfield lasers positioned approximately about a periphery of the wafer test plate for providing darkfield illumination at an angle of less than about six degrees to the wafer test plate.

21. An automated system for inspection of a substrate for defects, wherein the substrate comprises at least a portion of a wafer, the system comprising:

a platform arranged for moving the substrate during inspection, wherein the substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, at least one portion of a patterned wafer, an individual die, at least

US 7,729,528 B2

| 23 | 24 |

one portion of an individual die, plurality of individual die, at least one portion of a plurality of individual die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC tray, and an Auer boat;

a visual inspection device adapted to capture images associated with the substrate while the substrate is in motion relative to the visual inspection device;

a strobing illuminator configured to automatically illuminate at least a portion of the substrate while the substrate is in motion to aid in capture of the images by the visual inspection device; and

a processor configured to compare the captured images to a reference model during inspection to detect defects in the substrate.

**22**. The automated system of claim **21**, wherein the strobing illuminator comprises at least one of a brightfield illuminator, a darkfield laser and a darkfield illuminator.

**23**. The automated system of claim **21**, wherein the visual inspection device comprises a grey-scale camera.

**24**. The automated system of claim **21**, wherein the strobing illuminator is configured to selectively illuminate the substrate at a variable rate, wherein the variable rate is automatically adjusted to a speed associated with movement of the substrate relative to the visual inspection device.

**25**. An automated system for training a reference model for inspection of a substrate for defects, wherein the substrate comprises at least a portion of a wafer, the system comprising:

a moveable stage configured to move the substrate, wherein the substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, an individual die, at least one portion of a patterned wafer, an individual die, plurality of individual die, at least one portion of a plurality of individual die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC tray, and an Auer boat;

a visual inspection device adapted to capture images associated with the substrate while the substrate is in motion relative to the visual inspection device;

a strobing illuminator operative to automatically illuminate at least a portion of the substrate while the substrate is in motion relative to the visual inspection device; and

a processor configured to create a reference model based on the images associated with at least two known quality substrates.

**26**. The automated system of claim **25**, wherein the visual inspection device comprises a grey-scale camera.

**27**. An automated system for inspection of a substrate for defects, wherein the substrate comprises at least a portion of a wafer, the system comprising:

a moveable stage configured to move the substrate, wherein the substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, an individual die, at least one portion of an individual die, plurality of individual die, at least one portion of a plurality of individual die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC tray, and an Auer boat;

a visual inspection device adapted to capture images associated with the substrate;

a strobing illuminator operative to automatically illuminate at least a portion of the substrate while the substrate is in motion relative to the visual inspection device; and

a processor configured to generate a reference model from the captured images acquired from at least two known quality substrates, and compare the captured images

acquired from an unknown quality substrate to the reference model to detect defects in the unknown quality substrate.

**28**. The automated system of claim **27**, wherein the defects comprise a set of defects associated with bumps.

**29**. The automated system of claim **27**, wherein the visual inspection device comprises a grey-scale camera.

**30**. An automated method of inspecting a substrate for defects, wherein the substrate comprises at least a portion of a wafer, the method comprising:

moving a first reference known quality substrate relative to a visual inspection device;

collecting a first image associated with the first known quality substrate while the first reference known quality substrate is in motion relative to the visual inspection device;

moving a second reference known quality substrate relative to the visual inspection device;

collecting a second image associated with the second reference known quality substrate while the second reference known quality substrate is in motion relative to the visual inspection device;

creating a reference model based on the first image and the second image;

moving an unknown quality substrate relative to the visual inspection device, wherein the unknown quality substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, at least one portion of a patterned wafer, an individual die, at least one portion of an individual die, a plurality of individual die, at least one portion of a plurality of individual die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC tray, and an Auer boat;

automatically illuminating at least a portion of the unknown quality substrate while the unknown quality substrate is in motion relative to the visual inspection device;

collecting a set of images associated with the unknown quality substrate while at least a portion of the unknown quality substrate is illuminated and the unknown quality substrate is in motion relative to the visual inspection device; and

comparing the set of images to the reference model to detect defects in the unknown quality substrate.

**31**. The automated method of claim **30**, wherein the first known quality substrate, the second known quality substrate and the unknown quality substrate each comprise a die.

**32**. An automated system for inspection of a substrate for defects, wherein the substrate comprises at least a portion of a wafer, the system comprising:

a means for moving the substrate, wherein the substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, at least one portion of a patterned wafer, an individual die, at least one portion of an individual die, plurality of individual die, at least one portion of a plurality of individual die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC tray, and an Auer boat;

a means for capturing images associated with the substrate while the substrate is in motion;

a means for automatically illuminating at least a portion of the substrate while the substrate is in motion; and

a means for comparing the captured images to a reference model to detect defects in the substrate.

US 7,729,528 B2

25 26

**33.** The automated system of claim **32**, wherein the means for moving the substrate comprises at least one of a platform, a plate and a stage.

**34.** The system of claim **32**, wherein the means for capturing images comprises a grey-scale camera.

**35.** The system of claim **32**, wherein the means for automatically illuminating comprises a computer-controlled strobing illuminator.

**36.** The system of claim **32**, wherein the means for comparing comprises at least one of a microprocessor, a computer system, a computer-like device and a digital signal processor.

**37.** An automated system for inspection of a substrate for defects, wherein the substrate comprises at least a portion of a wafer, the system comprising:

a moveable platform adapted to move the substrate, wherein the substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, at least one portion of a patterned wafer, an individual die, at least one portion of an individual die, plurality of individual die, at least one portion of a plurality of individual die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC tray, and an Auer boat;

a robotic arm configured to provide the substrate to the moveable platform;

a brightfield illuminator configured to selectively strobe the substrate while the substrate is in motion;

a darkfield illuminator configured to selectively strobe the substrate while the substrate is in motion;

a focusing mechanism adapted to focus on a surface of the substrate;

a grey-scale camera adapted to capture images of the substrate while the substrate is in motion; and

a processor adapted to compare the images to a reference model to detect defects in the substrate.

**38.** The automated system of claim **37**, wherein the processor is further adapted to virtually align the substrate.

**39.** The automated system of claim **37**, wherein the reference model is based on a set of images from at least two known quality substrates.

**40.** The automated system of claim **37**, wherein the defects comprise a set of defects associated with bumps.

**41.** The automated system of claim **37**, wherein the brightfield strobing illuminator and darkfield strobing illuminated are configured to selectively illuminate the substrate at a variable rate, wherein the variable rate is automatically adjusted to a speed associated with movement of the substrate relative to the visual inspection device.

**42.** An automated system for inspection of a substrate on a film frame for defects, wherein the substrate comprises at least a portion of a wafer, the system comprising:

a platform arranged for moving the substrate during inspection, wherein the substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, at least one portion of a patterned wafer, an individual die, at least one portion of an individual die, plurality of individual die, at least one portion of a plurality of individual die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC tray, and an Auer boat;

a visual inspection device adapted to capture images associated with the substrate while the substrate is in motion relative to the visual inspection device;

a strobing illuminator configured to automatically illuminate at least a portion of the substrate while the substrate is in motion to aid in capture of the images by the visual inspection device; and

a processor configured to compare the captured images to a reference model during inspection to detect defects in the substrate.

**43.** An automated method of inspecting an unknown quality substrate comprising:

moving the unknown quality substrate, wherein the unknown quality substrate comprises at least a portion of a patterned wafer mounted on a film frame;

automatically strobing the unknown quality substrate while the unknown quality substrate is in motion;

capturing images of the unknown quality substrate while the unknown quality substrate is in motion;

comparing the images to a reference model to detect defects in the unknown quality substrate and make the unknown quality substrate a known quality substrate; and

performing at least one processing step on the known quality substrate, thereby transforming the known quality substrate into a further processed substrate.

**44.** The automated method of claim **43**, wherein the defects comprise at least one of metallization defects, diffusion defects, passivation layer defects, scribing defects, glassivation defects, sawing-related chips, sawing-related cracks, bump defects, bond pad area defects and probe area defects.

**45.** The automated method of claim **43**, wherein the defects consist essentially of a set of defects generally at a 1+ micron level.

**46.** The automated method of claim **43**, wherein the at least a portion of a wafer comprises a plurality of irregularly spaced die.

**47.** The automated method of claim **46**, wherein the plurality of irregularly spaced die are sawn.

**48.** The automated method of claim **46**, wherein the plurality of irregularly spaced die are die selected from all of the die on the at least a portion of a wafer.

**49.** The automated method of claim **43**, wherein the rate at which the unknown quality substrate is strobed varies with respect to the velocity of the unknown quality substrate.

**50.** The automated method of claim **43**, wherein the rate at which the unknown quality substrate is strobed varies during the inspection of the unknown quality substrate.

**51.** The automated method of claim **43**, wherein the rate at which the unknown quality substrate is strobed varies discontinuously.

**52.** The automated method of claim **46**, wherein the rate at which the unknown quality substrate is strobed varies in a manner that correlates to both the velocity of the unknown quality substrate and the position of the irregularly spaced die.

**53.** An automated method of inspecting an unknown quality substrate comprising:

moving the unknown quality substrate, wherein the substrate is selected from a group consisting of a whole patterned wafer, a sawn patterned wafer, a broken patterned wafer, at least one portion of a patterned wafer, an individual die, at least one portion of an individual die, plurality of individual die, at least one portion of a plurality of individual die, multiple die in a waffle pak, a multi-chip module (MCM), a JEDEC tray, and an Auer boat;

automatically strobing the unknown quality substrate while the unknown quality substrate is in motion varying a rate at which the unknown quality substrate is strobed during inspection, the rate at which the unknown quality substrate is strobed being at least partially correlated to both the rate at which the unknown quality substrate is

US 7,729,528 B2

**27**

moved and the relative positions of a plurality of regions of interest on the unknown quality substrate;

capturing images of at least one of the regions of interest on the unknown quality substrate while the unknown quality substrate is in motion;

comparing the images to a reference model to detect defects in the unknown quality substrate and make the

**28**

unknown quality substrate a known quality substrate; and

performing at least one processing step on the known quality substrate, thereby transforming the known quality substrate into a further processed substrate.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.       : 7,729,528 B2                                          Page 1 of  2
APPLICATION NO. : 10/915666
DATED            : June 1, 2010
INVENTOR(S)      : Jeffrey L. O'Dell et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 4, line 3, delete "inspections" and insert --inspection. --, therefore.

Column 4, line 23, delete "objectives" and insert --objective --, therefore.

Column 5, line 33, delete "summary," and insert -- summary --, therefore.

Column 5, line 36, delete "it," and insert -- it --, therefore.

Column 8, line 17, delete "of," and insert -- of --, therefore.

Column 8, line 60, delete "wafer," and insert -- wafer --, therefore.

Column 8, line 61, delete "inspects;" and insert -- inspects --, therefore.

Column 9, line 41, delete "it" and insert -- it. --, therefore.

Column 10, line 32, delete "one." and insert -- one --, therefore.

Column 12, line 61, delete "alignment" and insert -- alignment. --, therefore.

Column 13, lines 16-17, after "shown to", delete "are required to meet the definitional requirements of a mean and standard deviation)".

Column 13, line 19, after "two" insert -- are required to meet the definitional requirements of a mean and standard deviation) --.

Column 13, line 24, delete "user-provided" and insert -- user provided --, therefore.

Column 16, line 39, delete "determining," and insert -- determining --, therefore.

Column 16, line 54, delete "on," and insert -- on --, therefore.

Signed and Sealed this

Twenty-seventh Day of July, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*

**CERTIFICATE OF CORRECTION (continued)**
**U.S. Pat. No. 7,729,528 B2**

Column 20, line 24, delete "hereof" and insert -- thereof --, therefore.

Column 22, line 9, in claim 9, delete "therby" and insert -- thereby --, therefore.

Column 22, line 31, in claim 14, after "at least one portion of an individual die," insert -- a --.

Column 23, line 1, in claim 21, after "one portion of an individual die," insert -- a --.

Column 23, line 33, in claim 25, after "one portion of an individual die," insert -- a --.

Column 23, line 56, in claim 27, after "one portion of an individual die," insert -- a --.

Column 24, line 58, in claim 32, after "one portion of an individual die," insert -- a --.

Column 25, line 20, in claim 37, after "one portion of an individual die," insert -- a --.

Column 25, line 26, in claim 37, delete "brightileld" and insert -- brightfield --, therefore.

Column 25, line 28, in claim 37, delete "darkileld" and insert -- darkfield --, therefore.

Column 25, line 57, in claim 42, after "one portion of an individual die," insert -- a --.

Column 26, line 58, in claim 53, before "plurality" insert -- a --.

## **PROOF OF SERVICE**

I hereby certify that on July 13, 2015, a copy of the following document:

- Corrected Brief of Appellant Rudolph Technologies, Inc.

was filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Counsel for Appellees:

Wayne O. Stacy (wstacy@cooley.com)
Sarah J. Guske (sguske@cooley.com)
Sara J. Bradford (sbradford@cooley.com)
Cooley LLP
380 Interloken Crescent, 9th Floor
Broomfield, CO 80021

Thomas J. Friel, Jr. (tfriel@cooley.com)
Cooley LLP
3000 El Camino Real
Palo Alto, CA 94306

s/Daniel W. McDonald
Daniel W. McDonald

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>PURSUANT TO FEDERAL CIRCUIT RULE 32(a)</u>

Certificate of Compliance with Type Volume Limitation, Typeface Requirements, and Type Style Requirements:

1. This brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   - this brief contains 8,016 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

2. This brief complies with the typeface requirements of the Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   - this brief has been prepared in a proportionally spaced typeface, using Microsoft Word 14 Times New Roman font.

Dated: July 13, 2015          s/ Daniel W. McDonald
                              Daniel W. McDonald
                              Robert A. Kalinsky
                              Rachel C. Hughey
                              MERCHANT & GOULD P.C.
                              3200 IDS Center
                              80 South Eighth Street
                              Minneapolis, MN 55120
                              Telephone:  612-332-5300
                              Facsimile:  612-332-9081